## IN THE DISTRICT COURT OF CLEVELAND COUNTY
## STATE OF OKLAHOMA

Amanda Alexander, et.al.,

     **Plaintiffs,**

v.

Halliburton Company and Halliburton
Energy Services, Inc., SAIC Energy,
Environmental & Infrastructure, LLC,

     **Defendants**

STATE OF OKLAHOMA
CLEVELAND COUNTY } S.S.
**FILED** In The
Office of the Court Clerk

**OCT 31 2011**

DOCKET_____ PAGE_____ RECORDED
Rhonda Hall, Court Clerk

_____ DEPUTY

CJ-2011-1951-W

## PETITION

NOW COME the Plaintiffs, Amanda Alexander, Curtis Alpers, Tarranda Alpers,

Joe Alpers, Crystal Alpers-Perry, Teresa Alpers-Harig, Meisha Archer, James Brasher,

Mary Caroline Brasher, Cary Breeze, Lindsey Breeze, Roger Bridgman, Dena Bridgman,

William Browning, Cynthia Browning, Krystal Browning, Levi Browning, Will

Browning, Rhonda Coast, Virgil Coffman, Norma Coffman, Eric Cook, Marinda Cook,

Billy Crenwelge, Caroline Crenwelge, Jackie Crenwelge, Richard Crenwelge, Annetta

Crenwelge, Christopher Crenwelge, Meghan Crenwelge, Shirley Skitt, Chandler Griffith,

Ralph Fishgrab, Clay Hunt Fishgrab, Francis Lee Fite, Ronald Hillard Foster, Patsy

Garrison, Dee Gilbert-Blose, Mark Gourney, DeeAnn Gourney, Pattie Gracey, Paul

Gracey, Scarlett Harris, Merle Harris, Edwin Harris, Jennifer Healer, Matthew Healer,

Gerald Lawrence, Ted Robinson, Sandra Lolar, Ralph McNew, Michael Mortson, Gerry

Mortson, Voris Owens, Linda Pace, Rodney Pace, Travis Payne, Mary Payne, Donna



EXHIBIT
2

Qualls, Casey Rains, Jerry Sanders, Joyce Scroggins, Michael Smith, Greg Smith, Jennifer Steil, Michael Steil, Angela Stevenson, Trevin Stevenson, Barbara Wilkinson, Ed Waters, Brandon Nalley, William Welch, Shirley Welch, Robert Whetstone, Susan Whetstone, LaNena White, Michael White, Amy White, Robert Whitehead, Marian Kaye Whitehead, Jimmy Williams, Janet Williams, Deborah Willis, Carmon Womack, James Womack, Greg Wortham, Dena Wortham (collectively "Plaintiffs"), who by and through their attorneys, WEITZ & LUXENBERG, P.C. and HOMSEY, COOPER, HILL & CARSON and in support of this Complaint against defendants Halliburton Energy Services, Inc. and Halliburton Company (collectively, "Halliburton") and SAIC Energy, Environmental & Infrastructure, LLC , known at time relevant to this Complaint as The Benham Companies, LLC, ("Benham"), allege and state as follows:

## I. NATURE OF THE ACTION

1.     This action is brought to protect and seek redress for current and former residents of Duncan, Oklahoma, whose properties have been and continue to be contaminated by pollutants including, but not limited to, ammonium perchlorate and nitrates that have been released into the groundwater for decades by Halliburton, and many of whom, as detailed below, have suffered personal injuries due to the unknowing ingestion of these contaminants.

2.     Halliburton was engaged in dumping and releasing of these contaminants for more than 25 years, and was aware of the groundwater contamination for more than 20 years before it alerted any members of the community.  Indeed, Halliburton knew at least since the early 1990s that groundwater at the Duncan facility was heavily contaminated with

nitrates, and knew or at least suspected since 2008 that the groundwater was also contaminated with perchlorate, but did not inform local residents, including Plaintiffs, until July of 2011.

3.      Moreover, for nearly four years from 2005 to 2009, Halliburton and its environmental consultant, Benham, inexplicably failed to even test the few groundwater monitoring wells they had in place, which wells had previously shown extremely high levels of nitrates in the groundwater.

4.      Plaintiffs have suffered and will continue to suffer significant damages and injuries, as described in more detail below, as a result of Halliburton's wrongful conduct.

## II. JURISDICTION AND VENUE

5.      All Plaintiffs are individuals who reside, or who formerly resided at times materials to this complaint, in the cities of Duncan or Marlow, in Stephens County, Oklahoma, and who are currently residents of Oklahoma.

6.      Defendant SAIC Energy, Environmental & Infrastructure, LLC, formerly and at relevant times alleged in this complaint known as The Benham Companies, LLC, is a Delaware limited liability company with a principal place of business at 3700 West Robinson, Suite 200, Norman, Oklahoma.  Defendant SAIC Energy, Environmental & Infrastructure, LLC may be served with process at its principal place of business or its registered agent, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma.

7.      Defendant Halliburton Company is a Delaware corporation with its headquarters and principal place of business located at 3000 North Sam Houston Parkway East in

Houston, Texas. Defendant Halliburton Company's registered agent is The Corporation Company, and may be served with process at 1833 South Morgan Road, Oklahoma City, Oklahoma.

8.     Defendant Halliburton Energy Services, Inc. is a Delaware corporation with its headquarters and principal place of business located at 10200 Bellaire Boulevard, in Houston, Texas. Defendant Halliburton Energy Services, Inc.'s registered agent is The Corporation Company and may be served with process at 1833 South Morgan Road, Oklahoma City, Oklahoma.

9.     At all times material to this matter, Halliburton owned and operated the Halliburton Services Osage Road Facility, in Duncan, Oklahoma at 605 West Osage Road (the "Osage Road facility") and engaged in, and continues to engage in, the transaction of business within Stephens County, Oklahoma.

10.    Each of the Plaintiffs pray for judgment in an amount in excess of $75,000.00.

11.    This Court has proper personal jurisdiction, subject matter jurisdiction, and venue.

### III. GENERAL ALLEGATIONS

History of Operations at the Osage Road Facility

12.    From 1965 to 1992, Halliburton's primary operations at the Osage Road facility involved breaking down rockets and rocket motors for reuse.

13.    Beginning at least as early as 1965, Halliburton accepted spent military rocket motors at the Osage Road facility. Once at the facility, Halliburton removed the propellant from the rockets and cleaned and prepared them for reuse. The rocket propellant was composed largely of ammonium perchlorate, which, when it is allowed to

enter soils and groundwater, results in contamination of both N-Nitrate[s] ("nitrates") and perchlorate.

14.     Halliburton's process of cleaning the rocket motors consisted of first cleaning out the solid propellant and liner from the motors by a hydrojetting process. Halliburton discharged water into the motor case at high pressure to cut or force out the propellant and liner.

15.     The propellant and liner were then moved to a shaker table, which was intended to separate the process water, which at that point was contaminated with ammonium perchlorate, from the propellant and liner solids. Halliburton placed the solids in aluminum containers, and most of the water was returned to the jetting stream for reuse. Some of the water was not recaptured, however, and that water was collected in a settling tank to the extent it did not overflow the work area onto the surrounding soils.

16.     Either at the end of the day or once the process water became too "dirty" for reuse, Halliburton released the now contaminated water to the settling tank, where it was allowed to settle for up to three days. Halliburton intended this retention time to allow any remaining solid propellant or liner in the water to separate from the water; any leftover solids were collected and placed, along with the solids removed directly from the rocket, into a container for burning in burn pits, as described below. The water, which at this point was highly contaminated with ammonium perchlorate from the propellant, was pumped through a pipe or channel into an evaporation pond.

17.     At the time this rocket recovery operation ceased in the early 1990s, the evaporation pond was approximately 120 feet long by 85 feet wide and eight feet deep,

and held approximately 350,000 gallons of liquid.  The Oklahoma Department of Water Resources issued Halliburton a waste water discharge permit for the evaporation pond in 1971, labeling it a "No Discharge Lagoon."  Upon information and belief, the evaporation pond was unlined until approximately 1989, when Halliburton installed a synthetic liner.  Thus, until Halliburton finally lined the evaporation pond, contaminated water in the unlined pond would seep into the soil and groundwater.

18.     Even after the liner was installed, the pond was not fully protected against leaks. For example, when there were heavy rains, the evaporation pond would often overflow onto the surrounding unprotected ground, where it would seep into the soil and groundwater.  Upon information and belief, the liner and/or the pipe transporting the contaminated water to the pond were at times faulty or cracked, and allowed contaminated water to seep into the soil and groundwater.

19.     Halliburton's own analysis of the water in the evaporation pond in 1988 and 1992 showed perchlorate levels at over 35,000 milligrams per liter and 29,000 milligrams per liter, respectively.  These levels are approximately two million times higher than the current federal health advisory level for perchlorate in drinking water of 15 *micro*grams per liter.

20.     After removing the solid propellant from the rocket motor and shaking off some of the liquids, Halliburton took the propellant to earthen burn pits.  The burn pits were approximately 40 feet long by 15 feet wide and eight to 12 feet deep.  The pits were completely unlined at all times during more than two decades of these rocket recovery operations.

21.     Halliburton generally allowed the solids to dry for one or two days in the burn pits. During this drying time, contaminants, including ammonium perchlorate, continued to seep into the soil of the unlined burn pits and into the groundwater. Once the propellant dried for some period of time, Halliburton set it on fire; the burn lasted approximately eight minutes, but the remnants would "glow as ash" for several hours. Generally, Halliburton used two active pits so workers could alternate the pits each day, as the embers would often still be glowing the following day, preventing the use of that pit.

22.     Upon information and belief, perchlorate and nitrates entered the soil and groundwater from the burn pits. As stated above, Halliburton did not line the pits with anything, and contaminants from the propellant seeped directly into the soil and groundwater in and around the burn pits. In addition, when it rained, the material was left in the pit to be rained on, and not burned until dry. As a result, rainwater washed perchlorate and nitrates into the soil and groundwater. A report from the Oklahoma Department of Environmental Quality ("DEQ") noted that occasionally there would be standing water in the burn pits. On at least one occasion, the water was approximately two feet deep. The standing water would occasionally be pumped out of the burn pit to the evaporation pond. Much of this water would simply seep into the soils and groundwater under the burn pits.

23.     At least every two years, the burn pits became filled with liner material, soil, and ash; Halliburton then covered the pits with dirt and new pits were dug. A Halliburton report noted that a pit would contain approximately 171 cubic yards of residue and contaminated soil. Upon information and belief, Halliburton took no steps to cover the

pit with any type of cap or liner to prevent further contamination of the groundwater from rainwater seeping through the soil into the aquifer and carrying with it contamination from the pits.

24.    Upon information and belief, Halliburton disposed of approximately 30,000 to 80,000 pounds of ammonium perchlorate each year of operation; Halliburton records indicate that in the years 1980 through 1985, an average of nearly 50,000 pounds of propellant was burned each year, with the highest amount being 99,170 pounds burned in 1985.

25.    Halliburton knew at least as early at 1987 that the unlined burn pits were an environmental problem.  A 1987 Halliburton internal report stated that to be considered a treatment unit, Halliburton would "probably need to construct a concrete-lined unit, burn the propellant there, then haul off the ash or store it."  This recommendation was never followed, and Halliburton continued to use unlined burn pits until the operation was closed in the early 1990s.

26.    Upon information and belief, Halliburton represented to state and federal agencies that no hazardous wastes were generated in the rocket motor recovery operations.  In fact, by letter dated May 25, 1982, Steven Burford specifically informed the Oklahoma State Department of Health that "we have not generated hazardous waste, nor have we stored or disposed of any hazardous waste material in this area."

27.    In December of 1991, after Halliburton had applied for a permit to comply with applicable regulations for the rocket motor recovery operations, the Oklahoma State Department of Health issued Halliburton a Notice of Deficiency.  The notice stated that,

in their application, Halliburton was required to, but had failed to, address a large number of issues. Relevant to this Complaint, the notice stated that Halliburton must:

    a.  Provide information regarding the protection of groundwater and surface water at the facility, including the potential for migration of waste through the soil beneath the burn pits into the groundwater;

    b.  Provide information regarding the effectiveness and reliability of the burn pits to contain collect and confine wastes; and

    c.  Develop a groundwater monitoring plan to determine if hazardous constituents from the operation at the facility are in the groundwater;

28.    On September 14, 1992, Halliburton ceased its spent rocket motor operations and submitted a closure plan regarding these activities state authorities. Upon information and belief, this determination was due, in significant part, the Halliburton's desire to avoid the foregoing monitoring and investigatory requirements in the Notice of Deficiency.

29.    In August 1993, as part of Halliburton's closure plan, Halliburton evacuated waste from the most recently active burn pits and sent it to East Oak Landfill in Oklahoma City. Halliburton only performed this evacuation for pits that were active at that time. As described above, there were many inactive pits that had previously been covered with soil. Halliburton kept no record of the locations of these former burn pits, so they could not be evacuated.

30.     Also as part of the closure plan, Halliburton installed groundwater monitoring wells in the area believed to be the area of "the inactive burn pit site," to determine whether any hazardous wastes were migrating from that area.

31.     Halliburton also removed the pipe used for pumping water to the evaporation pond and the liner for disposal offsite.  Halliburton removed the contaminated water by evaporation or vacuum truck.  Halliburton records indicate that, after being put through a reverse osmosis process to attempt to remove contamination, this water was disposed of through the City of Duncan sewer system.  Upon information and belief, the closest City of Duncan sewage disposal pond is located to the northwest of the Halliburton facility, just north of Gatlin Road and east of Highway 81, and either Halliburton or the City of Duncan disposed of contaminated wastewater there.

32.     Upon information and belief, Halliburton retained Benham to conduct and oversee the monitoring of the groundwater at the Osage Road facility.

33.     Of all the soil sampling and groundwater testing that Halliburton and Benham performed, none of the tests checked for perchlorate until at least 2009.  In addition, neither Halliburton nor Benham placed any monitoring wells around or even down gradient from the evaporation pond until 2010.  The monitoring wells around the former burn pit area were up gradient from the evaporation pond and could not reveal any information regarding the groundwater under and migrating from the area around the evaporation pond.  In addition, the monitoring wells that were installed as part of the closure were all less than 30 feet deep.

34.    Halliburton and Benham did test the monitoring wells for nitrates, and at certain times detected extremely high levels.  In December of 1995, Benham found nitrate was at levels between 10 and 460 milligrams per liter, or parts per million ("ppm").  In December of 1999, Benham found that four of the five monitoring wells showed nitrates at levels above 260 ppm, with one well as high as 5,600 ppm.  Benham informed Halliburton about these results.  As these ranges suggest, the test results varied wildly; even tests at the same well would swing by orders of magnitude on different dates.

35.    At the time, as Halliburton and Benham both knew, the maximum allowable nitrate level in drinking water was 10 ppm.  Thus, Halliburton's own samples of groundwater at the site, taken and analyzed by Benham, showed levels of nitrate up to 560 times higher than the maximum allowable levels.  Notably, these tests showed nothing of the levels of contamination downgradient from the evaporation pond.

36.    Neither Halliburton nor Benham notified any local residents, including Plaintiffs, of the nitrates results.  Upon information and belief, the results still have not been reported by Halliburton or Benham to any local residents, including Plaintiffs, despite the fact that Halliburton and Benham both knew that the residents surrounding the site relied on private wells for their drinking water.

37.    Upon information and belief, at least as early as August 2008, possibly as a result of the high levels of nitrates detected in the monitoring wells, Halliburton and Benham both suspected that there was likely also a problem with perchlorate in the groundwater.

38.    Moreover, despite knowing of at least the high levels of nitrates contamination in the groundwater, and despite an obligation to conduct continuous testing, Halliburton and

Benham failed to test the water from the monitoring wells even a single time for nearly four years, from July of 2005 to June of 2009.

39.     Halliburton's knowledge of the potential for perchlorate issues dates at least to the 1980s.  A letter from Halliburton to the Oklahoma Department of Health dated August 9, 1988 states that perchlorate was found in the drinking water at the Halliburton facility, which came from a well on the site.  Halliburton eventually discontinued using well water at the site for drinking, electing to bring in bottled water.  The 1988 letter also notes that there was a "considerable amount" of perchlorate in the evaporation pond water, which the analysis showed to be over 35,000 ppm.

40.     As noted above, another analysis of the evaporation pond water in 1992 showed perchlorate concentration to be over 29,000 ppm.

41.     Halliburton was also advised of the potential for perchlorate contamination in the groundwater in 1990, as a site inspection performed March 27, 1990 noted a high potential for release to soil and groundwater from both the evaporation pond and the burn pits.

42.     Furthermore, in 2008, a Halliburton employee was documented to have discussed with the DEQ concern that perchlorates hadn't been tested for at the site and suggested that Halliburton reassess to test for perchlorates.

43.     Halliburton discussed the potential for perchlorate contamination with DEQ as early as August of 2008.

44.     Despite all of the forgoing, it was not until June of 2009 that Halliburton and Benham performed any tests for perchlorate in the groundwater.  Those tests revealed

perchlorate in the existing monitoring wells, at levels up to 6,100 ppb, more than 300 times the current health advisory level of 15 ppb.

45.    Apparently based on this testing, Halliburton and Benham decided to test for perchlorate beyond the area of the burn pits.  In May of 2010, Halliburton and Benham installed six new monitoring wells to test for perchlorate.  As described in detail below, these wells were installed downgradient from the existing wells in the former burn pit area, and also, for the first time, downgradient from the evaporation pond.

46.    In April or May of 2011, Halliburton and Benham found high levels of perchlorate in the groundwater at the Halliburton facility, which it believed to be migrating offsite to private property.  As a result, Halliburton contacted the DEQ, then, with Benham, conducted well water sampling of private water wells near the Halliburton facility on June 1 through June 6, 2011.

47.    The results of these tests showed high levels of perchlorate in the private wells of residents and in their drinking water.  Of approximately 176 total properties tested, 90 detected perchlorate, and 27 had perchlorate levels above the EPA advisory level of 15 ppb, with the highest over 50,000 ppb.

48.    For all of the reasons stated above, long before this testing confirmed the fact, Halliburton knew or should have known that its practices would result and had resulted in contaminants, including perchlorate and nitrates, polluting the groundwater, and that the contaminants would migrate to Plaintiffs' properties and wells.  Neither Halliburton nor Benham notified local residents of this hazard until July of 2011.  In fact, upon

information and belief, neither Halliburton nor Benham has ever alerted local residents, including Plaintiffs, to the potential for high levels of nitrates in their water.

49.     In August 2011, Halliburton entered a Memorandum of Agreement and Consent Order ("Order") with the DEQ regarding the contamination.  In the Order, Halliburton informed the DEQ that the Halliburton activities that are the source of, or may have contributed to, contamination at and surrounding the facility, include:

> a.  The storage of rinse water containing perchlorate from missile cleaning operations in an evaporation pond that resulted in the release and/or potential release of perchlorate to the soil and groundwater at the Halliburton site, and;
>
> b.  The torch cutting and storage of rod racks from a nuclear power plant in the Rod Rack Restricted Area ("RRRA") of the site that resulted in radiological contamination.

50.     The Order also states that the following conditions exist or have existed in the past at the Halliburton site that are not or were not in compliance with any environmental laws or regulations:

> a.  The discharging, releasing or leaching of perchlorate from the former evaporation pond into the soils and groundwater at the site;
>
> b.  The releasing, leaching or migrating of perchlorate from groundwater at the site into groundwater, aquifers, or water wells offsite; and
>
> c.  The on-site radiological contamination from the RRRA and the burn pits at the site.

<u>The Groundwater and Plume of Contamination</u>

51.     Halliburton's operations described above have resulted in a plume of contamination polluting groundwater at and surrounding the Osage Road Facility (the "Plume").

52.     At least at shallow levels, Halliburton and Benham have reported that the groundwater of the area around the former burn pits at the Halliburton facility flows in different directions.  They reported these flow patterns in a May 2010 sampling plan. Specifically, in trying to detect the flow of perchlorate contamination at the facility, they sought to place additional sampling wells "downgradient" from existing wells "[b]ased on groundwater flow direction."  In the burn pit area, Benham placed new monitoring wells 8 and 9 to the northwest of existing monitoring well 4 (which was on the northwest corner of the burn pit area), indicating a northwesterly flow of groundwater in that area. New monitoring wells 12 and 13 were placed north of existing well 7, which was on the north side of the burn pit area, indicating a northerly flow of groundwater in that area. New monitoring wells 10 and 11 were placed south of existing monitoring well 1 (which was on the southeastern part of the burn pits), and east and southeast of existing wells 2 and 3 (which were on the southern portion of the burn pit area), indicating a flow of groundwater to the east and southeast of that portion of the facility.  Finally, new monitoring wells 14, 15 and 16 were placed to the south and southeast of the evaporation pond, confirming a basically southeasterly flow from that area of the facility.

53.     More recent sampling has further revealed high levels of perchlorate contamination to the west of the Osage road facility, indicating that groundwater from the facility also flows to the west, likely due to seasonal pumping in the area.

54.     The heaviest contamination has appeared to the southeast of the evaporation pond, which is consistent with the general flow of groundwater in the area.  But perchlorate has also been found north and northwest of the facility, consistent with Halliburton's beliefs of flows in those directions from the former burn pit areas.

55.     Upon information and belief, and based on testing done to date, the Plume of groundwater contamination currently extends from the Halliburton Osage Road facility in the south and southeast directions to Camelback Road, to the west of the site beyond Highway 7, and to the north and northwest of the Osage Road facility in the area extending to and slightly above Gatlin Road.

56.     It is entirely possible, and evidence developed in discovery may reveal, that the Plume currently extends or formerly extended further than the area described above, but for the purposes of this Complaint, the Plume is defined as set forth above, based on existing data and Halliburton's own reports.  Indeed, due to the high solubility, stability, and mobility in water of both perchlorate and nitrates, the plume could potentially extend much further than this.  As an example, a perchlorate plume at a site in California extends more than nine miles.

57.     Based on the long duration and method of operations detailed above, and on the testing of groundwater that has occurred at and surrounding the Halliburton Osage Road

facility, it is clear that residents in the vicinity of the Halliburton facility were exposed to high levels of these contaminants for many years, and continue to be exposed today.

Contaminants at Issue

58.     Ammonium perchlorate is a manufactured form of perchlorate salt primarily used as an oxidizer in fuel for rockets and other explosives; 90 percent of perchlorate in the United States is estimated to be ammonium perchlorate from the defense and aerospace industries.

59.     Ammonium perchlorate is extremely soluble in water, and mobile in the environment—migrating quickly from soil to groundwater.  It is also very stable and can persist in groundwater for decades.  As noted above, ammonium perchlorate can show up in groundwater as nitrates and perchlorate.

60.     When ingested, perchlorate blocks the transport of iodide from the blood into the thyroid gland; iodide uptake is essential for the synthesis of thyroid hormones (thyroxine ($T_4$) and triiodothyronine ($T_3$)).

61.     Thyroid hormones are essential to the regulation of oxygen consumption and metabolism in adults, as well as for growth and neuro- and physical development in fetuses, infants and young children; they affect the functions of nearly every organ system.

62.     Deficient iodide uptake and the resultant deficient hormone production results in hypothyroidism, a condition associated with the following symptoms and/or ailments: female infertility, irregular or heavy menstrual cycles, poor muscle tone, fatigue, hyperprolactinemia, elevated serum cholesterol, increased sensitivity to cold,

constipation, rapid thoughts, muscle cramps and joint pain, weakness, thin or brittle fingernails, coarse hair, paleness, decreased sweating, dry or itchy skin, slow speech and a hoarse voice, weight gain, low heart rate, goiter, loss of equilibrium, decreased concentration, an enlarged thyroid gland, and depression.  Hypothyroidism has also been linked to rare complications such as severe depression, impaired memory, hair loss, anemia, deafness, heart failure, and coma.  Some medical studies also suggest that hypothyroidism can cause ovarian cysts.

63.     Short-term exposure to high doses of perchlorate can also cause eye and skin irritation, coughing, nausea, vomiting, and diarrhea.

64.     Maintaining adequate levels of thyroid hormones during pregnancy is critical for proper fetal brain development.  A 2010 study by the EPA Office of the Inspector General showed that a pregnant mother with inadequate hormone levels can cause a child to have the following developmental ailments: attention-deficit/hyperactivity disorder, lower verbal intelligence quotient, lower overall IQ, lower motor performance, and mild thyroid dysfunction later in childhood.

65.     Studies showing the harmful effects of perchlorates were first published in the 1950s.  They included that perchlorates impair normal thyroid function and affect a fetus more seriously than an adult.

66.     Although as yet unregulated by the EPA, perchlorate has been on the EPA's Contaminant Candidate List beginning in 1998.  EPA has decided to regulate perchlorate under the Safe Drinking Water Act ("SDWA"), but has not yet issued a finalized regulation.

67.     EPA has issued an interim health advisory level for perchlorate at 15 parts per billion (ppb), or micrograms (μg) per liter.

68.     Other states that have already set Maximum Contaminant Levels ("MCLs") for perchlorate include Massachusetts and California.  California set a MCL for perchlorate at 6 ppb, and in January 2011, released a draft technical support document for a public health goal of 1 ppb.  Massachusetts set a MCL for perchlorate at 2 ppb, with a reporting level of 0.0010 mg/L.

69.     Halliburton and Benham knew or should have known that perchlorate was dangerous at least since the early 1980s, as it was categorized as a hazardous waste under RCRA; Halliburton also noted that it had researched the effects that ingestion of perchlorate can have on human health in a letter from Halliburton to the Oklahoma Department of Health dated August 9, 1988.  Halliburton and Benham also should have known of the dangers of perchlorate to human health based on the studies performed and published in the 1950s.

70.     Plaintiffs, however, had no way of knowing that Halliburton was dumping so much perchlorate and were unable to detect perchlorate in their private wells without specifically testing for it.

71.     Nitrates, which can also result from ammonium perchlorate contamination, are also highly mobile, allowing them to easily leach into groundwater.

72.     Ingestion of high levels of nitrate can cause methemoglobinemia, a condition where the blood cannot carry enough oxygen.  This condition is especially dangerous to infants, and can result in "blue baby syndrome," which if left untreated can cause death.

Methemoglobinemia can also result in long-term digestive and respiratory problems to infants or children affected.

73.     Prolonged consumption of high levels of nitrate is also linked to gastric problems in humans, and common symptoms of high nitrate intake include abdominal pain, diarrhea, muscular weakness, and poor coordination.

74.     A Scientific Assessment of Perchlorate from the Office of the Inspector General for the EPA in 2010 states that nitrate can also block iodide uptake by the thyroid.

75.     The EPA has set a MCL for nitrates in the form of $NO_3$ - N, the same form as that discovered in high levels at the Halliburton facility, at 10 micrograms per liter.

Nuclear Fuel Rack Operation

76.     In addition to the rocket motor recovery operations detailed above, Halliburton has also engaged in operations that potentially threaten nearby residents, including Plaintiffs, with radioactive contamination.  Because, upon information and belief, Halliburton has never tested for radiation off-site, it is simply not known at this time whether and at what levels of radiation Halliburton's neighbors have been exposed to, or how far that radiation has spread.  Nevertheless, the history of these operations is included here as background of the nature and quality of the operations performed by Halliburton at the facility.

77.     In approximately November 1983, Halliburton began receiving spent fuel racks from the Fort Calhoun, Nebraska nuclear reactor under a license issued by the Nuclear Regulatory Commission ("NRC"); Halliburton received a total of 21 racks between November 1983 and April 1984.

78.   Halliburton originally intended to decontaminate the racks and sell the cleaned metal as scrap, but feasibility tests showed that decontamination was not possible; Halliburton then "torch cut" the racks into smaller pieces, repackaged the pieces and sent the material to a disposal facility out of state.

79.   From approximately July 1985 through September 1985, Halliburton cut the racks into pieces, with all of the cutting performed inside of a tent erected solely for this purpose and equipped with ventilation.

80.   In January 1987, the NRC performed an unannounced inspection of the Halliburton facility in response to an anonymous call to the Oklahoma Department of Health alleging that unlawful activities involving radioactive material were being performed on the site.  The NRC found multiple violations, including, but not limited to, the following:

   a.   the tent used to contain the cutting operations was not as authorized by the license which required a wooden substructure;

   b.   adjacent "burn pits" were used to burn contaminated personal protective equipment;

   c.   the tent may have been ineffective due to hot slag burning holes into the tent; and

   d.   employees routinely ran non-HEPA filtered air conditioning units—a practice procedurally forbidden.

81.   As a result of the cutting operations, radioactivity persists today at elevated levels in certain areas of the Halliburton Osage Road facility.  The NRC found numerous spots of radioactive contamination at the facility, with radiation readings ranging from several

times background levels to several millirems per hour. The radiation is believed to come from the radionuclide Cesium-137, and also possibly from Cobalt-60.

82.   A site assessment performed for Halliburton in October 2002 determined that contamination at the facility is in excess of the 25 mrem per year unrestricted release dose limit set by the NRC.

## IV. SPECIFIC ALLEGATIONS RELATING TO PLAINTIFFS

83.   As the terms are used below, a "PI Plaintiff" is defined as an individual who suffered personal injury due to Halliburton's wrongful actions; a "Property Owner Plaintiff" is defined as an individual who currently owns property affected by Halliburton's wrongful actions; and a "Non-Owner Resident Plaintiff" is defined as an individual who has suffered the loss of the use and enjoyment of the home in which he or she resides, but does not own, due to Halliburton's wrongful actions. As detailed below, some Plaintiffs fall within multiple categories.

**Amanda Alexander**

84.   Plaintiff Amanda Alexander resided at 7209 N. Highway 81, Duncan, Oklahoma from 1991 through 2000. Ms. Alexander is a "PI Plaintiff" as that defined term is used in this Complaint.

85.   During the time Ms. Alexander resided at the property, she obtained the water she used at home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Alexander has in the past been

exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

86.     While residing at the above properties, Ms. Alexander relied on contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming.

87.     Plaintiff Amanda Alexander was diagnosed in 2009 with hypothyroidism.  She was also diagnosed as infertile in 2000, and with anxiety and depression in 2005.  These illnesses and disabilities have resulted from her exposure to contaminated well water.

88.     Ms. Alexander has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  She has felt scared to drink her water and betrayed by Halliburton upon learning that a neighboring company that she thought she could trust had been polluting her water for years without her knowledge.

**Curtis and Tarranda Alpers**

89.     Plaintiffs Curtis and Tarranda Alpers, husband and wife, have owned and resided at the property located at 5505 North Highway 81 in Duncan, Oklahoma since April 1974. Mr. and Mrs. Alpers are "Property Owner Plaintiffs" as that defined term is used in this Complaint, and Mrs. Alpers is also a "PI Plaintiff" as that defined term is used in this Complaint.  They are collectively referred to as "the Alpers."

90.     From 1974 through 2011, the Alpers obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater within the Plume of Contamination, defined above, which has resulted from

Halliburton's actions.  Accordingly, the Alpers have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

91.    Prior to learning of the contamination of their groundwater, the Alpers relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, filling a recreational swimming pool, and watering livestock.  In addition, the Alpers consumed vegetables they grew in a garden on the property watered with contaminated well water for approximately 36 years.  The Alpers discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, washing dishes, watering the lawn and garden, filling a recreational swimming pool, and watering livestock, and have been unable to use the well water for any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

92.    Plaintiff Tarranda Alpers was diagnosed in 2006 with hypothyroidism.  This illness and disability resulted from her exposure to contaminated well water.

93.    The Alpers have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  Mr. and Mrs. Alpers also had to move livestock that they used to keep near the property for fear of the horses becoming injured from drinking contaminated water.

94.    The value of the Alpers' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the

at the property and in the vicinity of Duncan, Oklahoma generally

**Joe Alpers and Crystal Alpers-Perry**

95.    Plaintiffs Joe Alpers and Crystal Alpers-Perry owned and resided at the property

located at 4650 North 5th Street, Duncan, Oklahoma from June 1980 through October

1990. Mr. Alpers and Ms. Alpers-Perry are "PI Plaintiffs" as that defined term is used in

this Complaint.

96.    During the time Mr. Alpers and Ms. Alpers-Perry resided at the property, they

obtained the water they used at home from a private well on the property.  The well sits

above and draws water from groundwater contaminated by the Plume of contamination,

defined above, which has resulted from Halliburton's actions.  Accordingly, Mr. Alpers

and Ms. Alpers-Perry have in the past been exposed to, and, as alleged below, injured by,

the groundwater contaminated by Halliburton.

97.    While residing at the above property, Mr. Alpers and Ms. Alpers-Perry relied on

contaminated well water for the purposes of drinking, cooking, bathing, washing dishes,

watering the lawn and garden, and filling a pool for recreational swimming.  They also

consumed fruits and vegetables grown on the property and watered with contaminated

well water on a regular basis when in season.

98.    Mr. Alpers experienced frequent diarrhea while at the property, and he has

suffered mental anguish and emotional distress as a result of learning that he had

unknowingly been drinking, consuming and had otherwise been exposed to contaminated

groundwater for years.  It has caused him to lose sleep, and he is concerned that the stress

of learning about the contamination is upsetting is already high blood pressure.

99.     Ms. Alpers-Perry has suffered from ovarian cysts since 2010, and has suffered

mental anguish and emotional distress as a result of learning that she had unknowingly

been drinking, consuming and had otherwise been exposed to contaminated groundwater

for years.  She is very concerned about the long term effects that she may suffer as a

result of drinking contaminated water for over 10 years.

**Teresa Alpers-Harig**

100.   Plaintiff Teresa Alpers-Harig resided at the property located at 4650 North 5th

Street, Duncan, Oklahoma from June 1980 through October 1990.  Ms. Alpers-Harig is a

"PI Plaintiff" as that defined term is used in this Complaint.

101.    From June 1980 through October 1990, Ms. Alpers-Harig obtained the water she

used at her home from a private well on the property.  The well sits above and draws

water from groundwater contaminated by the Plume of contamination, defined above,

which has resulted from Halliburton's actions.  Accordingly, Ms. Alpers-Harig has in the

past been exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

102.   Prior to learning of the contamination of her groundwater, Ms. Alpers-Harig relied

on contaminated well water for the purposes of drinking, cooking, bathing, washing

dishes, watering the lawn and garden, and filling a pool for recreational swimming.  In

addition, she consumed fruits and vegetables grown on the property and watered with

contaminated well water on a regular basis seasonally.

103. Plaintiff Teresa Alpers-Harig was diagnosed in 2009 with enlarged thyroid glands. This illness and disability has resulted from her exposure to contaminated well water.

104. Ms. Alpers-Harig has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. She feels very upset and apprehensive that she was exposed to contaminated water for so long and is disturbed that her children were also exposed to contaminated water while she raised them at the property. She has suffered considerable stress due to the contamination.

**Meisha Archer**

105. Plaintiff Meisha Archer resided at the properties located at Route 2 Box 169 and Route 6 Box 240, Duncan, Oklahoma during most weekends and partial summers from the years 1969 through 1973 and from 1977 through 1992. Ms. Archer is a "PI Plaintiff" as that defined term is used in this Complaint.

106. During the times that Ms. Archer resided on the property, she obtained the water she used at the home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Archer has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

107. Throughout the years Ms. Archer spent time at the above properties, she relied on the contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. In addition, Ms. Archer consumed fruits and

vegetables grown on the property and watered with contaminated well water every summer.

108.    Plaintiff Ms. Archer was diagnosed in 2005 with hypothyroidism.  This illness and disability has resulted from her exposure to contaminated well water.

109.    Ms. Archer has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  Upon learning of the contamination, Ms. Archer has been losing sleep, and she continues to suffer from bipolar disorder.

**James and Mary Caroline Brasher**

110.    Plaintiffs James and Mary Caroline Brasher, husband and wife, have owned and resided at the property located at 430 East Camelback Road, Duncan, Oklahoma since October 2001.  Both James and Mary are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined terms are used in this Complaint.  They are collectively referred to as "the Brashers."

111.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Brashers obtained the water they used at their home from a private well on the property  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the Brashers have been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

112.   Prior to learning of the contamination of their groundwater, the Brashers relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden.  In addition, the Brashers consumed fruits and vegetables grown on the property and watered with contaminated well water every summer.  The Brashers discontinued usage of the water well upon the announcement of the contamination in July 2011, and have been unable to use the well water for almost any purpose since that time, thus substantially interfering with the use and enjoyment of their property.

113.   The Brashers have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  The Brashers have lost sleep due to the stress and worry of the contamination.

114.   The value of the Brashers' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the at the property and in the vicinity of Duncan, Oklahoma generally.

**Cary and Lindsey Breeze**

115.   Plaintiffs Cary and Lindsey Breeze, husband and wife, resided at the property located at 5525 North 5th Street, Duncan, Oklahoma from 2006 through 2010.  Cary Breeze and Lindsey Breeze are "PI Plaintiffs" as that defined term is used in this Complaint.  They are collectively referred to as "the Breezes."

116.    From 2006 through 2010, the Breezes obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the Breezes have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

117.    From 2006 through 2010, the Breezes relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn.

118.    Plaintiff Cary Breeze was diagnosed in 2011 with low thyroid levels.  This illness and disability has resulted from his exposure to contaminated well water.

119.    The Breezes have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  Their worry and concern over the discovery of the groundwater contamination has caused them to lose sleep.  They are very concerned for the future health of their family.

**Roger and Dena Bridgman**

120.    Plaintiffs Roger and Dena Bridgman, husband and wife, have owned and resided at the property located at Route 2 Box 74 (212 East Gatlin Road), Marlow, Oklahoma since 2005.  Both Roger and Dena are "Property Owner Plaintiffs" as that defined term is used in this Complaint.  They are collectively referred to as "the Bridgmans."

121.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Bridgmans obtained the water they

used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the Bridgmans have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

122.    Prior to learning of the contamination of their groundwater, the Bridgmans relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn.  The Bridgmans have continued usage of the water well upon the announcement of the contamination in July 2011.

123.    The value of the Bridgmans' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**William, Cynthia, Krystal, Will and Levi Browning**

124.    Plaintiffs William and Cynthia Browning, husband and wife, have owned and resided at the property located at Route 6, Box 224, Duncan, Oklahoma since August 2001.  Plaintiff Krystal Browning, their daughter, has also resided at the above property since August 2001.  William and Cynthia Browning also bring claims on behalf of their minor children William Browning IV ("Will"), age 15, born August 23, 1996, and Levi Browning, age 10, born July 8, 2001.  Plaintiffs William, Cynthia, Krystal, Will, and Levi are all "PI Plaintiffs," both William and Cynthia Browning are "Property Owner

Plaintiffs," and Krystal, Will, and Levi are all "Non-Owner Resident Plaintiffs" as those defined terms are used in this Complaint. William, Cynthia, Krystal, Will and Levi are collectively referred to as "the Brownings."

125. From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Brownings obtained the water they used at their home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Brownings have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

126. Prior to learning of the contamination of their groundwater, the Brownings relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Brownings consumed tomatoes, cucumbers, okra, peppers and lettuce grown on the property and watered with contaminated well water for two years. The Brownings discontinued usage of the water well upon the announcement of the contamination in July 2011, and have been unable to use the well water for almost any purpose since that time, thus substantially interfering with the use and enjoyment of their property.

127. Plaintiff Levi Browning was diagnosed in September 2011 with borderline low hypothyroidism. He also suffers from a learning disability and anxiety. These illnesses and disabilities have resulted from his exposure to contaminated well water.

128.   Plaintiff William Browning has also experienced many symptoms of

hypothyroidism, including weight gain, exhaustion, hair loss, and joint pain.  These

illnesses and disabilities have resulted from his exposure to contaminated well water.

129.   The Brownings have also suffered mental anguish and emotional distress as a

result of learning that they had unknowingly been drinking, consuming and had otherwise

been exposed to contaminated groundwater for years.  Cynthia Browning has felt

overwhelmed and fearful upon learning of the contamination.  William Browning has felt

extremely upset and frustrated upon learning of the contamination.  He felt constantly

bothered by Halliburton employees who continued to come to his home after news of the

contamination came out, and he was unable to rest.  He is fearful that Halliburton's

actions have caused him to have unknowingly poisoned his children for years.  He is

extremely chagrined that he and his family have spent years making improvements to

their home and property, only to learn that it is now contaminated.  Krystal Browning has

felt extremely inconvenienced by the contamination.  She has felt stressed, to the point

where it is affecting her everyday life.  She has had trouble concentrating due to stress

about the contamination.

130.   The value of the Brownings' property has been greatly diminished as a result of

the contamination.  Prospective buyers will be unwilling to purchase a property with a

contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the

property and in the vicinity of Duncan, Oklahoma generally.

**Rhonda Coast**

131.    Plaintiff Rhonda Coast resided at the property located at Route 2 Box 149,

Duncan, Oklahoma from 1970 through August 1983, and at the property located at Route

2, "Gatlin School" from February 1985 through July 1987.  Ms. Coast is a "PI Plaintiff"

as that defined term is used in this Complaint.

132.    From 1970 through 1983 and from 1985 through 1987, Ms. Coast obtained the

water she used at her home from a private well on the property.  The well sits above and

draws water from groundwater contaminated by the Plume of contamination, defined

above, which has resulted from Halliburton's actions.  Accordingly, Ms. Coast has in the

past been exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

133.    When residing at the above properties, Ms. Coast relied on contaminated well

water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn

and garden, and recreating in water sprinklers.  In addition, Ms. Coast consumed fruits

and vegetables grown on the property and watered with contaminated well water every

summer.

134.    Plaintiff Rhonda Coast was diagnosed in 1987 with hypothyroidism.  She has also

suffered from hair loss and depression since 1987.  In 1979, she was diagnosed with

severe migraines, and in 1987 she experienced frequent diarrhea.  These illnesses and

disabilities have resulted from her exposure to contaminated well water.

135. Ms. Coast has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

**Virgil and Norma Coffman**

136. Plaintiffs Virgil and Norma Coffman, husband and wife, have owned and resided at the property located at Route 6 Box 216, Duncan, Oklahoma since 1991. Mr. and Mrs. Hardy are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined terms are used in this Complaint. They are collectively referred to as "the Coffmans."

137. From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Coffmans obtained the water they used at their home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Coffmans have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

138. Prior to learning of the contamination of their groundwater, the Coffmans relied on their contaminated well water for the purposes of cooking, bathing, washing dishes, and watering the lawn and garden. In addition, the Coffmans consumed fruits and vegetables grown on the property and watered with contaminated well water in 2010. The Coffmans are now connected to city water, but have been unable to use the well water for almost any purpose since July 2011, thus substantially interfering with the use and enjoyment of their property.

139. The Coffmans have suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Plaintiff Mrs. Coffman has been very stressed upon learning of the contamination and is worried about the damage that the contamination may have caused.

140. The value of the Coffmans' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Eric and Marinda Cook**

141. Plaintiffs Eric and Marinda Cook, husband and wife, have owned and resided at the property located at 582 Walnut Hill, Duncan, Oklahoma since approximately 2006. Eric and Marinda are "Property Owner Plaintiffs" as those defined terms are used in this Complaint. They are collectively referred to as "the Cooks."

142. From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Cooks obtained the water they used at their home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Cooks have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

143.    Prior to learning of the contamination of their groundwater, the Cooks relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn, doing laundry, and watering animals.  The Cooks have discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing and washing dishes, and have been unable to use the water for any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

144.    The value of the Cooks' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Billy and Caroline Crenwelge**

145.    Plaintiffs Billy and Caroline Crenwelge have owned and resided at the property located at 216 W. Gatlin Road, Marlow, Oklahoma since June 1996.  Both Billy and Caroline are "PI Plaintiffs," Caroline is a "Property Owner Plaintiff," and Billy is a "Non-Owner Resident Plaintiff" as those defined terms are used in this Complaint.  They are collectively referred to as "the Crenwelges."

146.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Crenwelges obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above,

which has resulted from Halliburton's actions. Accordingly, the Crenwelges have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

147.    Prior to learning of the contamination of their groundwater, the Crenwelges relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Crenwelges consumed fruits, vegetables, and livestock grown on the property and watered with contaminated well water every summer. The Crenwelges discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, and have been unable to use the well water for any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

148.    Plaintiff Caroline Crenwelge has suffered from various ailments since 1996, including dry skin, vomiting, headaches, diarrhea, and burning eyes. Ms. Crenwelge has also had thyroid problems since the late 1970s. Upon information and belief, these illnesses and disabilities have resulted from her exposure to contaminated well water.

149.    Plaintiff Billy Crenwelge has suffered from various ailments since 1996 including dry skin, burning and irritated skin and eyes, diarrhea, vomiting, fatigue, headaches, and cramps. Upon information and belief, these illnesses and disabilities have resulted from his exposure to contaminated well water.

150.    The Crenwelges have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise

been exposed to contaminated groundwater for years.  Plaintiff Billy Crenwelge has had difficulty sleeping and feels very stressed upon learning of the contamination.

151.   The value of the Crenwelges' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Jackie Crenwelge**

152.   Plaintiff Jackie Crenwelge has resided at the property located at 218 West Gatlin Road, Marlow, Oklahoma since 1990.  Mr. Crenwelge is a "P.I. Plaintiff" and a "Non-Owner Resident Plaintiff" as those defined terms are used in this Complaint.

153.   From the time he moved into the property to the time that he learned of the contamination of the groundwater in July 2011, Mr. Crenwelge obtained the water he used at his home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Mr. Crenwelge has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

154.   Prior to learning of the contamination of their groundwater, Mr. Crenwelge relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden.  In addition, Mr. Crenwelge consumed fruits and vegetables grown on the property and watered with contaminated well water.  Mr.

Crenwelge has discontinued usage of the water well upon the announcement of the contamination in July 2011, and has been unable to use the well water for almost any purpose since that time, thus substantially interfering with the use and enjoyment of the property on which he resides.

155.   Plaintiff Jackie Crenwelge experienced various ailments during 1998 while he resided at the above address, including fatigue, dry skin, vomiting and diarrhea, headaches, cramps, and burning eyes after showering.  Upon information and belief, these illnesses and disabilities have resulted from his exposure to contaminated well water.

156.   Mr. Crenwelge has also suffered mental anguish and emotional distress as a result of learning that he had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

**Richard and Annetta Crenwelge, Christopher and Meghan Crenwelge, Shirley Skitt, and Chandler Griffith**

157.   Plaintiffs Richard and Annetta Crenwelge, husband and wife, have owned and resided at the property located at 214 West Gatlin Road, Marlow, Oklahoma since June 1996.  Both Richard and Annetta are "PI Plaintiffs" and "Property Owner Plaintiffs" as those defined terms are used in this Complaint.  Plaintiffs Christopher and Meghan Crenwelge, husband and wife, also resided at the above address.  Christopher resided there from 1996 through 2008 and again from 2010 through 2011.  Meghan resided there from 2005 through 2008 and again in 2010.  Both Christopher and Meghan are "PI Plaintiffs" as that defined term is used in this Complaint.  Richard, Annetta, Christopher

and Meghan are collectively referred to as "the Crenwelges." Plaintiff Shirley Skitt has also resided at 214 West Gatlin Road, Marlow, Oklahoma since approximately 1999, and previously resided at the property located at 218 West Gatlin Road, Marlow, Oklahoma from 1997 through 1999. Ms. Skitt is a "PI Plaintiff" and a "Non-Owner Resident Plaintiff" as those defined terms are used in this Complaint. Plaintiff Chandler Griffith resided at the property located at 214 West Gatlin Road, Marlow, Oklahoma during 2011, and at the property located on the corner of North 5th Street and Osage Road, Duncan, Oklahoma from 2008 through 2010. Mr. Griffith is a "PI Plaintiff" as that defined term is used in this Complaint.

158.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Crenwelges, Ms. Skitt, and Mr. Griffith obtained the water they used at their home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Crenwelges, Ms. Skitt, and Mr. Griffith have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

159.    Prior to learning of the contamination of their groundwater, the Crenwelges, Ms. Skitt, and Mr. Griffith relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, filling a pool for recreational swimming, and watering their pets and livestock. In addition, the Crenwelges, Ms. Skitt, and Mr. Griffith consumed fruits and vegetables grown on the property and watered with contaminated well water.

160.   The Crenwelges have suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  Plaintiffs Christopher and Meghan have suffered considerable stress upon learning of the contamination because Meghan consumed well water at the above address while she was pregnant with her son.  She and Christopher are fearful for the health of their infant son.

161.   The value of the Crenwelges' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

162.   Plaintiff Ms. Skitt has suffered from anxiety and depression since approximately 2000.  She also has had irregular menstrual cycles and possible fertility problems and may have a swollen thyroid.  Upon information and belief, these diseases and illnesses have resulted from her exposure to contaminated well water.

163.   Plaintiff Shirley Skitt has also suffered mental anguish and emotional distress as a result of learning that he had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

164.   Plaintiff Chandler Griffith has also suffered mental anguish and emotional distress as a result of learning that he had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  He has had trouble sleeping upon learning of the contamination.

**Ralph and Clay Hunt Fishgrab**

165.     Plaintiffs Ralph Fishgrab and Clay Hunt Fishgrab, husband and wife, own the

property located at 620 Blackjack Lane, Duncan, Oklahoma.  Mr. and Mrs. Fishgrab

"Property Owner Plaintiffs" as those defined terms are used in this Complaint.  They are

collectively referred to as "the Fishgrabs."

166.     The Fishgrabs were preparing to drill a well on their property before learning of

the contamination.  Their property sits above and any well drilled on the property would

draw water from groundwater contaminated by the Plume of contamination, defined

above, which has resulted from Halliburton's actions. Accordingly, the Fishgrabs'

property has in the past been exposed to, and, as alleged below, injured by, the

groundwater contaminated by Halliburton.

167.     The value of the Fishgrabs' property has been greatly diminished as a result of the

contamination.  Prospective buyers will be unwilling to purchase a property that lies

above contaminated groundwater and soil, and, even if a reliable alternative water source

is obtained, the value of the property will forever be greatly diminished by the past

contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Francis Lee Fite**

168.     Plaintiff Frances Lee Fite resided at the property located at 5450 Quail Drive,

Duncan, Oklahoma from December 1988 through November 2004.  Ms. Fite is a "PI

Plaintiff" as that defined term is used in this Complaint.

169.     During the time Ms. Fite resided at the property, she obtained the water she used

at her home from a private well on the property.  The well sits above and draws water

from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Fite has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

170.    During the time she lived at the above property, Ms. Fite relied on her contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. In addition, Ms. Fite consumed fruits and vegetables grown on the property and watered with contaminated well water every summer most years.

171.    Ms. Fite was diagnosed in 2004 with hypothyroidism. This illness and disability has resulted from her exposure to contaminated well water.

172.    Ms. Fite has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. She fears for her own health and the health of her son. She is also upset and disappointed because she sold her land to her son, hoping it would be valuable to him, but now it is contaminated and has lost significant value.

**Ronald Hillard Foster**

173.    Plaintiff Ronald Hillard Foster has owned and resided at the property located at 7209 North Highway 81, Duncan, Oklahoma since December 1991. Mr. Foster is a "Property Owner Plaintiff" and a "PI Plaintiff" as those defined terms are used in this Complaint.

174.     From the time he moved into the property to the time that he learned of the contamination of his groundwater in July 2011, Mr. Foster obtained the water he used at his home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Mr. Foster has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

175.     Prior to learning of the contamination of his groundwater, Mr. Foster relied on his contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn, filling a pool for recreational swimming, and operating a beauty shop. Mr. Foster discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, washing dishes, filling a swimming pool, and operating a beauty shop, and has been unable to use the well water for almost any other purpose since that time, thus substantially interfering with the use and enjoyment of his property.

176.     Mr. Foster has suffered mental anguish and emotional distress as a result of learning that he had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  He has suffered from stress and an upset stomach.  He is extremely concerned for the future health of his children, especially since his daughter already has thyroid and reproductive problems caused by the contamination.

177.     The value of Mr. Foster's property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a

contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the

property and in the vicinity of Duncan, Oklahoma generally.

**Patsy Garrison**

178.    Plaintiff Patsy Garrison Plaintiffs resided at the property located at Route 2, Box

149 (The Twin Oaks Golf Course), Duncan, Oklahoma from 1966 through 1973.  Ms.

Garrison is a "PI Plaintiff" as that defined term is used in this Complaint.

179.    During the time Ms. Garrison resided at the property, she obtained the water she

used at her home from a private well on the property. The well sits above and draws

water from groundwater contaminated by the Plume of contamination, defined above,

which has resulted from Halliburton's actions.  Accordingly, Ms. Garrison has in the past

been exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

180.    During the time Ms. Garrison resided at the above property, she relied on her

contaminated well water for the purposes of drinking, cooking, bathing, washing dishes,

and watering the lawn and garden.  In addition, Ms. Garrison consumed fruits and

vegetables grown on the property and watered with contaminated well water daily every

summer.

181.    Plaintiff Ms. Garrison was diagnosed in the late 1960s with hypothyroidism.  This

illness and disability has resulted from her exposure to contaminated well water.

182.   Ms. Garrison has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

**Dee Gilbert-Blose**

183.   Plaintiff Dee Gilbert-Blose resided at the property located at Route 2 Box 149, Duncan, Oklahoma from 1970 through 1982.  Ms. Gilbert-Blose is a "PI Plaintiff" as that defined term is used in this Complaint.

184.   During the time Ms. Gilbert-Blose resided at the property, she obtained the water she used at the home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Ms. Gilbert-Blose has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

185.   During the time Ms. Gilbert-Blose resided at the property, she relied on the contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden.

186.   Plaintiff Dee Gilbert-Blose was diagnosed in 1997 with hypothyroidism.  She has also had various issues with depression.  These illnesses and disabilities have resulted from her exposure to contaminated well water.

187.   Ms. Gilbert-Blose has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise

been exposed to contaminated groundwater for years.  Upon learning of the

contamination, she has felt shocked and overwhelmed.

**Mark and DeeAnn Gourney**

188.    Plaintiffs Mark and DeeAnn Gourney, husband and wife, have owned and resided

at the property located at 5420 Day Street, Duncan, Oklahoma since 1994.  DeeAnn is a

"PI Plaintiff" and both DeeAnn and Mark are "Property Owner Plaintiffs" as those

defined terms are used in this Complaint.  They are collectively referred to as "the

Gourneys."

189.    From the time they moved into the property to the time that they learned of the

contamination of their groundwater in July 2011, the Gourneys obtained part of the water

they used at their home from a private well on the property, the remainder of the water

they used came from city water.  The well sits above and draws water from groundwater

contaminated by the Plume of contamination, defined above, which has resulted from

Halliburton's actions.  Accordingly, the Gourneys have in the past been exposed to, and,

as alleged below, injured by, the groundwater contaminated by Halliburton.

190.    Prior to learning of the contamination of their groundwater, the Gourneys relied on

their contaminated well water for the purposes of watering the lawn and garden.  In

addition, the Gourneys consumed fruits and vegetables grown on the property and

watered with contaminated well water one to two times per day, 12 months per year.  The

Gourneys discontinued usage of the water well upon the announcement of the

contamination in July 2011, and have been unable to use the well water for almost any

purpose since that time, thus substantially interfering with the use and enjoyment of their property.

191.    Plaintiff DeeAnn Gourney was diagnosed with a swollen thyroid.  This illness and disability has resulted from her exposure to contaminated well water.

192.    The Gourneys have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

193.    The value of the Gourneys' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Pattie and Paul Gracey**

194.    Plaintiffs Pattie and Paul Gracey, husband and wife, have owned and resided at the property located at 5425 Quail Drive, Duncan, Oklahoma since April 2009.  Ms. Gracey is a "P.I. Plaintiff" and both Pattie Gracey and Paul Gracey are "Property Owner Plaintiffs" as those defined terms are used in this Complaint.  They are collectively referred to as "the Graceys."

195.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Graceys obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above,

which has resulted from Halliburton's actions. Accordingly, the Graceys have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

196.   Prior to learning of the contamination of their groundwater, Graceys relied on contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Graceys consumed fruits and vegetables grown on the property and watered with contaminated well water daily during the summers of 2010 and 2011. The Graceys discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming, and has been unable to use the well water for any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

197.   Ms. Gracey has suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. She feels violated and extremely stressed and depressed. She feels guilt for unknowingly subjecting visitors to her home to contaminated water. She has had difficulty sleeping. She has also had to endure unexpected costs to pay for clean water as a result of the contamination.

198.   The value of the Graceys' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Edwin, Scarlett, and Merle Harris**

199.    Plaintiffs Edwin and Scarlett Harris, husband and wife, have owned and resided at the property located at 340 Blackjack Lane, Duncan, Oklahoma since 2005.  Edwin and Scarlett are both "Property Owner Plaintiffs" as that defined term is used in this Complaint.  Merle Harris has also resided at the above property since 2005, and resided at Route 6 Box 240 from January 1986 through May 2005.  Merle Harris is a "PI Plaintiff" as that defined term is used in this Complaint.  Edwin, Scarlett, and Merle are collectively referred to as "the Harrises."

200.    For all times that the Harrises resided at 340 Blackjack Lane, they obtained the water they used at their home from connection to city water.  However, their property sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Thus, although they have not been exposed to contaminants through their drinking water, their property is still affected.  During the time Merle Harris resided at Route 6 Box 240, she obtained the water she used at that home from a private well on the property.  That well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Merle Harris has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

201.    The value of the Harrises' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property that lies above contaminated groundwater and soil, and, even through a reliable alternative water source may be available, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

202.    Merle Harris has suffered from thyroid nodules.  This illness and disability has resulted from her exposure to contaminated well water.  Merle Harris has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  She wakes up several times each night worried about her health and the health of her children.  She has recently started taking depression medication to deal with her distress over the contamination.

**Jennifer and Matthew Healer**

203.    Plaintiff Jennifer Healer resided at the property located at 4875 North 5th Street, Duncan, Oklahoma from 1983 through 1987, and at the property located at 4870 North 5th Street from 1987 through 2003.  Ms. Healer is a "PI Plaintiff" as that defined term is used in this Complaint.  Ms. Healer also brings claims on behalf of her minor child Matthew Healer, age 11, born June 7, 2000.  Matthew Healer is also a "PI Plaintiff."

204.    From 1983 through 2003, Ms. Healer obtained the water she used at her home from a private well on the property.  The wells sit above and draw water from groundwater contaminated by the Plume of contamination, defined above, which has

resulted from Halliburton's actions.  Accordingly, Jennifer and Matthew Healer have been exposed to and, as alleged below, injured by, the groundwater contaminated by Halliburton.

205.   While residing at the above properties, Ms. Healer relied on contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming.  In addition, Ms. Healer consumed fruits and vegetables grown on the property and watered with contaminated well water daily.

206.   Ms. Healer also relied on contaminated well water for all of the above purposes while she was pregnant with her son, Michael Healer.  Michael Healer was thus exposed to contaminated well water while in the womb, and continued to be exposed to contaminated well water after his birth in 2000 until he and Ms. Healer left the property in 2003.

207.   Plaintiff Jennifer Healer was diagnosed with hypothyroidism and underactive thyroid disease in 1992, at the age of 12.  Her hypothyroidism has caused her to be hospitalized for various reasons, and doctors told her that when she nearly died due to sepsis it was caused by her thyroid problems.  She has also had to take medication to treat her hypothyroidism from 1992 through present.  Ms. Healer has also suffered from severely abnormal menstrual cycles.  She is now infertile.  Each of these illnesses and disabilities has resulted from her exposure to contaminated well water.

208.   Plaintiff Matthew Healer was born two months premature and suffers from asthma.  Each of these illnesses and disabilities has resulted from his exposure to contaminated well water.

209.   Jennifer Healer has also suffered mental anguish and emotional distress as a result of learning that she and her son had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

**Gerald Lawrence and Ted Robinson**

210.   Plaintiffs Gerald Lawrence and Ted Robinson have owned and resided at the property located at 4801 East Osage Road, Duncan, Oklahoma since June 1998.  Mr. Lawrence and Mr. Robinson are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined terms are used in this Complaint.

211.   From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, Mr. Lawrence and Mr. Robinson obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Mr. Lawrence and Mr. Robinson have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

212.   Prior to learning of the contamination of their groundwater, Mr. Lawrence and Mr. Robinson relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and watering livestock and animals.  In addition, Mr. Lawrence and Mr. Robinson consumed fruits and vegetables

grown on the property and watered with contaminated well water regularly every summer. Mr. Lawrence and Mr. Robinson discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, washing dishes, and watering the lawn and garden, and have been unable to use the well water for any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

213.   Mr. Lawrence and Mr. Robinson have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Mr. Lawrence has lost sleep and become irritable and less social due to the stress he has felt upon discovering the contamination. He has lost his peace of mind and feels he can no longer trust his water supply. The stress has consumed his thought process.

214.   The value of Mr. Lawrence and Mr. Robinson's property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Sandra Lolar**

215.   Plaintiff Sandra Lolar has owned and resided at the property located at 1145 East Camelback Road, Duncan, Oklahoma since March 1979. Ms. Lolar is a "P.I. Plaintiff" and a "Property Owner Plaintiff" as those defined terms are used in this Complaint.

216.    From the time she moved into the property to the time that she learned of the contamination of their groundwater in July 2011, Ms. Lolar obtained the water she used at her home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Lolar has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

217.    Prior to learning of the contamination of their groundwater, Ms. Lolar relied on her contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Ms. Lolar consumed fruits and vegetables grown on the property and watered with contaminated well water throughout the year. Ms. Lolar limited her usage of the water well upon the announcement of the contamination in July 2011, thus substantially interfering with the use and enjoyment of their property.

218.    Plaintiff Sandra Lolar was diagnosed with borderline low thyroid levels and depression. She has also suffered from fatigue since the mid-1990s. These illnesses and disabilities have resulted from her exposure to contaminated well water.

219.    Ms. Lolar has also suffered mental anguish and emotional distress as a result of learning that she had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

220.    The value of Ms. Lolar's property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a

contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the

property and in the vicinity of Duncan, Oklahoma generally.

**Ralph McNew**

221.   Plaintiff Ralph McNew has resided at the property located at Route 2 Box 258

(1002 West Osage Road), Duncan, Oklahoma since August 2001.  Mr. McNew is a "PI

Plaintiff" as that defined term is used in this Complaint.

222.   From the time he moved into the property to the time that he learned of the

contamination of their groundwater in July 2011, Mr. McNew obtained the water he used

at the home from a private well on the property.  The well sits above and draws water

from groundwater contaminated by the Plume of contamination, defined above, which

has resulted from Halliburton's actions.  Accordingly, Mr. McNew has in the past been

exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

223.   Prior to learning of the contamination of his groundwater, Mr. McNew relied on

the contaminated well water for the purposes of drinking, cooking, bathing, washing

dishes, watering the lawn and garden, and watering animals and pets.  In addition, Mr.

McNew consumed fruits and vegetables grown on the property and watered with

contaminated well water daily every summer except the summer of 2011.  Mr. McNew

discontinued usage of the water well upon the announcement of the contamination in July

2011 for all purposes except bathing, washing dishes, watering the lawn, and watering

animals and pets, and has been unable to use the well water for almost any other purpose since that time, thus substantially interfering with the use and enjoyment of his property.

224.    Plaintiff Ralph McNew was diagnosed in 2001 with anxiety.  He has also experienced stomach pains and cramps since 2008.  These illnesses and disabilities have resulted from his exposure to contaminated well water.

225.    Mr. McNew has also suffered mental anguish and emotional distress as a result of learning that he had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  Mr. McNew is filled with anxiety over the discovery of the contamination, and wonders every day if the contaminated water caused the death of his wife and his family's medical problems.

**Michael and Gerry Mortson**

226.    Plaintiffs Michael Mortson and Gerry Rawlings Mortson, husband and wife, have owned and resided at the property located at 5445 Quail Drive, Duncan, Oklahoma since August 1989.  Both Mr. Mortson and Mrs. Rawlings Mortson are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined terms are used in this complaint.  Michael and Gerry Mortson are referred to collectively as "the Mortsons."

227.    From the time they moved into the property August 1989 to the time that they learned of the contamination of their groundwater in July 2011, the Mortsons obtained the water they used at their home from a private well on the property The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the Mortsons have

been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

228.    Prior to learning of the contamination of their groundwater, the Mortsons relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. In addition, the Mortsons grew apricots, apples, peaches, and melons on the property and watered them with contaminated well water seasonally each year. The Mortsons discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, washing some dishes, and watering the lawn, and have been unable to use the well water for any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

229.    The Mortsons have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Mrs. Mortson was recently diagnosed with an irregular heartbeat that may have been caused by stress. Mr. Mortson now requires sleeping pills to sleep through the night or the stress would keep him awake. The Mortsons are very stressed due to the contamination, and are overwhelmed by financial difficulties caused by the contamination.

230.    The value of the Mortsons' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Voris Owens**

231.   Plaintiff Voris Owens has owned and resided at the property located at 5630 Quail Drive, Duncan, Oklahoma since September 1987.  Mr. Owens is a "PI Plaintiff" and a "Property Owner Plaintiff" as those defined terms are used in this Complaint.

232.   From the time he moved into the property to the time that he learned of the contamination of their groundwater in July 2011, Mr. Owens obtained the water he used at his home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Mr. Owens has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

233.   Prior to learning of the contamination of their groundwater, Mr. Owens relied on his contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and watering his animals.  In addition, Mr. Owens consumed fruits and vegetables grown on the property and watered with contaminated well water in season.  Mr. Owens discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than cooking, bathing, dishes, watering the lawn and garden, and watering his animals, and has been unable to use the well water for any other purpose since that time, thus substantially interfering with the use and enjoyment of his property.

234.   Plaintiff Voris Owens was diagnosed in 2006 with hypothyroidism.  This illness and disability has resulted from her exposure to contaminated well water.

235.   Mr. Owens has also suffered mental anguish and emotional distress as a result of learning that he had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  He is constantly angry, and worried about the expenses of obtaining a new water supply.  The stress of the contamination has caused his psoriasis to return.  Mr. Owens has also been unable to sell the vegetables from his garden due to the news of the contamination.

236.   The value of Mr. Owens' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Linda and Rodney Pace**

237.   Plaintiffs Linda Pace and Rodney Pace, husband and wife, have owned and resided at the property located at Route 6 Box 218, Duncan, Oklahoma since April 1982.  Both Linda and Rodney Pace are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined terms are used in this Complaint.  They are collectively referred to as "the Paces."

238.   From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Paces obtained the water they used at their home from a private well on the property.  The well sits above and draws water

from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Paces have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

239.   Prior to learning of the contamination of their groundwater, the Paces relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Paces consumed fruits and vegetables grown on the property and watered with contaminated well water every summer. The Paces discontinued usage of the water well upon the announcement of the contamination in July 2011, and have been unable to use the well water for almost any purpose since that time, thus substantially interfering with the use and enjoyment of their property.

240.   Plaintiff Linda Pace was diagnosed in February 2001 with hypothyroidism. This illness and disability has resulted from her exposure to contaminated well water.

241.   The Paces have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Mrs. Pace feels extremely mad and confused upon learning of the contamination, to the point that it makes her physically sick. She has lost sleep, had headaches, experienced chest pains, and felt extremely stressed all as a result of learning that Halliburton has contaminated their water supply.

242.   The value of the Paces' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a

contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the

property and in the vicinity of Duncan, Oklahoma generally.

**Travis and Mary Payne**

243.   Plaintiffs Travis and Mary Payne, husband and wife, have owned and resided at

the property located at Route 6 Box 274, Duncan, Oklahoma since 1977.  Travis and

Mary Payne are "Property Owner Plaintiffs" as those defined terms are used in this

Complaint.  They are collectively referred to as "the Paynes."

244.   From the time they moved into the property to the time that they learned of the

contamination of their groundwater in July 2011, the Paynes obtained the water they used

at their home from a private well on the property.  The well sits above and draws water

from groundwater contaminated by the Plume of contamination, defined above, which

has resulted from Halliburton's actions.  Accordingly, the Paynes have been exposed to,

and, as alleged below, injured by, the groundwater contaminated by Halliburton.

245.   Prior to learning of the contamination of their groundwater, the Paynes relied on

their contaminated well water for the purposes of drinking, cooking, bathing, washing

dishes, watering the lawn and garden, and filling a pool for recreational swimming.  The

Paynes have continued usage of the water well upon the announcement of the

contamination in July 2011.

246.   The Paynes have also suffered mental anguish and emotional distress as a result of

learning that they had unknowingly been drinking, consuming and had otherwise been

exposed to contaminated groundwater for years.

247.    The value of the Paynes' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Donna Qualls**

248.    Plaintiff Donna Qualls owns the property located at 5105 North 5th Street, Duncan, Oklahoma. Ms. Qualls is a "Property Owner Plaintiff" as that defined term is used in this Complaint.

249.    Ms. Qualls owns at least five acres of property located at the above address through a trust with her sister. The property sits above the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Qualls's property has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

250.    The value of the Ms. Qualls's property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property that lies above contaminated groundwater and soil, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally

**Casey Rains**

251.    Plaintiff Casey Rains has owned and resided at the property located at Route 2 Box 98A, Marlow, Oklahoma since May 2007.  Mr. Rains is a "Property Owner Plaintiff" and a "PI Plaintiff" as those defined terms are used in this Complaint.

252.    From the time he moved into the property to the time that he learned of the contamination of their groundwater in July 2011, Mr. Rains obtained the water he used at his home both from a private well on the property and from connection to a rural water system.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Mr. Rains has been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

253.    Mr. Rains has suffered mental anguish and emotional distress as a result of learning that his property and groundwater have been contaminated for years.  He is very concerned about his and his family's safety upon learning of the contamination, and is very worried about the value of his property.

254.    The value of Mr. Rains' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Jerry Sanders**

255.   Plaintiff Jerry Sanders has owned and resided at the property located at 965 Oak Ridge Drive, Duncan, Oklahoma since June 1994. Ms. Sanders is a "Property Owner Plaintiff" as that defined term is used in this Complaint.

256.   From the time she moved into the property to the time that she learned of the contamination of the groundwater in July 2011, Ms. Sanders obtained the water she used at her home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Sanders has in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

257.   Prior to learning of the contamination of the groundwater, Ms. Sanders relied on her contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn. Ms. Sanders discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than cooking, bathing, washing dishes and watering the lawn, thus substantially interfering with the use and enjoyment of her property.

258.   The value of Ms. Sander's property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Joyce Scroggins**

259.    Plaintiff Joyce Scroggins has owned and resided at the property located at Route 2

Box 164, Duncan, Oklahoma since 1956.  Ms. Scroggins is a "Property Owner Plaintiff"

and a "PI Plaintiff" as those defined terms are used in this Complaint.

260.    From the time Ms. Scroggins moved into the property to the time that she learned

of the contamination of their groundwater in July 2011, Ms. Scroggins obtained the water

she used at her home from a private well on the property.  The well sits above and draws

water from groundwater contaminated by the Plume of contamination, defined above,

which has resulted from Halliburton's actions.  Accordingly, Ms. Scroggins has in the

past been exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

261.    Prior to learning of the contamination of their groundwater, Ms. Scroggins relied

on her contaminated well water for the purposes of drinking, cooking, bathing, washing

dishes, and watering the lawn and garden.  In addition, Ms. Scroggins consumed fruits

and vegetables grown on the property and watered with contaminated well water every

summer.  Ms. Scroggins discontinued usage of the water well upon Halliburton's delivery

of water to her, and has been unable to use the well water for any purpose other than

bathing and washing dishes since that time, thus substantially interfering with the use and

enjoyment of her property.

262.    Ms. Scroggins has also suffered mental anguish and emotional distress as a result

of learning that she had unknowingly been drinking, consuming and had otherwise been

exposed to contaminated groundwater for years.

263.   The value of Ms. Scroggins' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Michael and Greg Smith**

264.   Plaintiffs Michael Smith and Greg Smith resided at the property located at 5275 North 5th Street, Duncan, Oklahoma from November 2002 through August 2010. Michael and Greg are "P.I. Plaintiffs" as that defined term is used in this Complaint. They are collectively referred to as "the Smiths."

265.   During the time that they resided at the above address, the Smiths obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the Smiths have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

266.   During the time that they resided at the above address, the Smiths relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden.  In addition, the Smiths consumed fruits and vegetables grown on the property and watered with contaminated well water daily when in season.

267.    Plaintiff Michael Smith has experienced rapid weight gain since 2008 that he believes may be due to a thyroid condition.  He has also experienced headaches since 2005.  Upon information and belief, these illnesses and disabilities resulted from his exposure to contaminated well water.

268.    Plaintiff Greg Smith has also experienced symptoms he believes are related to a thyroid condition, including depression, anxiety and headaches, diagnosed in 2007. Upon information and belief, these illnesses and disabilities resulted from his exposure to contaminated well water.

269.    The Smiths have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

**Jennifer and Michael Steil**

270.    Plaintiffs Jennifer and Michael Steil, husband and wife, have owned and resided at the property located at 4650 North 5th Street, Duncan, Oklahoma together since October 1997.  Jennifer resided at the above property since 1995, and at the property located at Route 1 Box 69B, Duncan, Oklahoma from January 1981 through October 1995. Michael resided at Route 1 Box 69B from November 1980 through June 1997.  Both Jennifer and Michael are "PI Plaintiffs" and "Property Owner Plaintiffs" as those defined terms are used in this Complaint.  They are collectively referred to as "the Steils."

271.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Steils obtained the water they used at their home from a private well on the property.  The well sits above and draws water

from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Steils have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

272.   Prior to learning of the contamination of their groundwater, the Steils relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. The Steils discontinued usage of the water well upon the announcement of the contamination in July 2011 except for the purposes of bathing and washing dishes, and have been unable to use the well water for almost any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

273.   Plaintiff Jennifer Steil has suffered from various symptoms and illnesses since 2000, including, but not limited to, fatigue, muscle weakness, digestive difficulties, irregular heart beats, thinning hair, sensitivity to cold and heat, and thin, brittle fingernails. Upon information and belief, her illnesses and disabilities have resulted from her exposure to contaminated well water.

274.   The Steils have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Mr. Steil often wakes up in the morning gagging, and he is extremely concerned and distressed over his wife's diminishing health.

275.   The value of the Steils' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a

contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Trevin and Angela Stevenson**

276.  Plaintiffs Trevin and Angela Stevenson, husband and wife, have owned and resided at the property located at 4420 Odom Drive, Duncan, Oklahoma since June 2005. Angela Stevenson is a "PI Plaintiff" and both Trevin and Angela are "Property Owner Plaintiffs" as those defined terms are used in this Complaint. They are collectively referred to as "the Stevensons."

277.  From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Stevensons obtained the water they used at their home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Stevensons have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

278.  Prior to learning of the contamination of their groundwater, the Stevensons relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. The Stevensons have discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than watering the lawn, and have been unable to use the water for almost any other

purpose since that time, thus substantially interfering with the use and enjoyment of their property.

279.   Plaintiff Angela Stevenson has suffered from menstrual issues since 2006.  Upon information and belief, this condition has resulted form her exposure to contaminated well water.

280.   The value of the Stevensons' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Barbara Wilkinson , Edward Waters, and Brendan Nalley**

281.   Plaintiff Barbara Wilkinson has owned and resided at the property located at 5525 Quail Drive, Duncan, Oklahoma since May 2006.  Ms. Wilkinson is a "PI Plaintiff" and a "Property Owner Plaintiff" as those defined terms are used in this Complaint. Plaintiff Edward Waters has resided at the above property since March 2009.  Mr. Waters is a "Non-Owner Resident Plaintiff" as that defined term is used in this Complaint. Plaintiff Brendan Nalley has resided at the above property since August 2008.  Mr. Nalley is a "Non-Owner Resident Plaintiff" as that defined term is used in this Complaint.

282.   From the time Ms. Wilkinson, Mr. Waters, and Mr. Nalley moved into the property to the time that they learned of the contamination of her groundwater in July 2011, they obtained the water they used at their home from a private well on the property.

The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. Wilkinson, Mr. Waters, and Mr. Nalley have been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

283.    Prior to learning of the contamination of their groundwater, Ms. Wilkinson, Mr. Waters, and Mr. Nalley relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. In addition, they consumed fruits and vegetables grown on the property and watered with contaminated well water. Ms. Wilkinson, Mr. Waters, and Mr. Nalley discontinued usage of the water well upon the announcement of the contamination in July 2011 for purposes other than bathing, washing dishes, and watering the lawn, and have been unable to use the well water for almost any other purpose since that time, thus substantially interfering with the use and enjoyment of their property.

284.    Ms. Wilkinson, Mr. Waters, and Mr. Nalley have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Ms. Willkinson has been very stressed out and irritated. The stress of all of the contamination has caused her to experience more frequent migraines and nosebleeds.

285.    The value of Ms. Wilkinson's property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**William and Shirley Welch**

286.     Plaintiffs William and Shirley Welch, husband and wife, own and reside at the property located at 970 Walnut Hill Drive, Duncan, Oklahoma.  William and Shirley are both "PI Plaintiffs" and "Property Owner Plaintiffs" as those defined terms are used in this Complaint.  They are collectively referred to as "the Welches."

287.     From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Welches obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the Welches have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

288.     Prior to learning of the contamination of their groundwater, the Welches relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn.  The Welches limited the usage of the water well upon the announcement of the contamination in July 2011, thus substantially interfering with the use and enjoyment of their property.

289.     Plaintiff William Welch was diagnosed in 2001 with hypothyroidism.  This illness and disability has resulted from his exposure to contaminated well water.

290.    Plaintiff Shirley Welch was diagnosed in 2000 with hypothyroidism.  This illness and disability has resulted from her exposure to contaminated well water.

291.    The Welches have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  They feel violated and hurt that they were never told about the contamination before July 2011.

292.    The value of the Welches' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Robert and Susan Whetstone**

293.    Plaintiffs Robert and Susan Whetstone, husband and wife, owned and resided at the property located at 4875 North 5th Street, Duncan, Oklahoma from 1983 through 1987, and at the property located at 4870 North 5th Street, Duncan, Oklahoma from 1987 through 2003.  Both Robert and Susan are "PI Plaintiffs" as that defined term is used in this Complaint.  They are collectively referred to as "the Whetstones."

294.    During the time they resided at the above properties, the Whetstones obtained the water they used at their home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, the

Whetstones have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

295.    During the time the Whetstones resided at the above properties, they relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Whetstones consumed fruits and vegetables grown on the property and watered with contaminated well water daily when in season.

296.    Plaintiff Susan Whetstone was diagnosed in approximately 2001 with hypothyroidism. This illness and disability has resulted from her exposure to contaminated well water.

297.    The Whetstones have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.

**LaNena White**

298.    Plaintiff LaNena White resided at the property located at Route 2 Box 149, Marlow, Oklahoma from 1961 through 1973. Ms. White is a "PI Plaintiff" as that defined term is used in this Complaint.

299.    During the time that Ms. White resided at the above property, she obtained the water she used at the home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, Ms. White has in the

past been exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

300.   Prior to learning of the contamination of her groundwater, Ms. White relied on the

contaminated well water for the purposes of drinking, cooking, bathing, washing dishes,

watering the lawn and garden, and watering the Twin Oaks Golf Course.  In addition, Ms.

White consumed fruits and vegetables grown on the property and watered with

contaminated well water daily in season.  She also spent time in the creeks on and

surrounding the property.

301.   Plaintiff LaNena White was diagnosed in the 1980s with hypothyroidism.  She

was also diagnosed with rapid heart beats in the 1980s.  These illnesses and disabilities

have resulted from her exposure to contaminated well water.

302.   Ms. White has also suffered mental anguish and emotional distress as a result of

learning that they had unknowingly been drinking, consuming and had otherwise been

exposed to contaminated groundwater for years.

**Michael and Amy White**

303.   Plaintiffs Michael and Amy White, husband and wife, have owned and resided at

the property located at Route 2 Box 73, Duncan, Oklahoma since November 1980.  Both

Michael and Amy are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined

terms are used in this Complaint.  They are collectively referred to as "the Whites."

304.   From the time they moved into the property to the time that they learned of the

contamination of their groundwater in July 2011, the Whites obtained the water they used

at their home from a private well on the property.  The well sits above and draws water

Page 78 of 100

from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Whites have been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

305.    Prior to learning of the contamination of their groundwater, the Whites relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Whites consumed fruits and vegetables grown on the property and watered with contaminated well water approximately two times per week. The Whites have continued usage of the water well upon the announcement of the contamination in July 2011.

306.    The Whites have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years. Mr. White suffers from constant headaches, requiring him to take multiple pain relievers every day. He also has lost weight due to the stress of the contamination, and now needs to take sleeping pills. Mrs. White has also suffered from sleeping problems due to the contamination, waking in the middle of the night with stress over her own health and the health of her family, and the value of their land.

307.    The value of the Whites' property has been greatly diminished as a result of the contamination. Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value

of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Robert and Marian Kaye Whitehead**

308.     Plaintiffs Robert and Marian Kaye Whitehead, husband and wife, resided at the property located at 5450 Quail Drive, Duncan, Oklahoma briefly in 1993, and Robert Whitehead continued to visit and drink the water at that residence through 2011. Robert Whitehead is a "PI Plaintiff" as that defined term is used in this Complaint. They are collectively referred to as "the Whiteheads."

309.     During the time that the Whiteheads resided at the property, they obtained the water they used at their home from a private well on the property The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Whiteheads have been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

310.     During their time at the above residence, the Whiteheads relied on their contaminated well water for the purposes of drinking, cooking, bathing, and washing dishes. In addition, the Whiteheads consumed fish caught from a well-fed pond.

311.     Plaintiff Robert Whitehead was diagnosed in 2008 with hypothyroidism. This illness and disability has resulted from his exposure to contaminated well water.

312.     The Whiteheads have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise

been exposed to contaminated groundwater for years. Robert Whitehead is very angry that Halliburton was contaminating the water for years and he never knew about it.

**Jimmie and Janet Williams**

313.    Plaintiffs Jimmie and Janet Williams have owned and resided at the property located at Route 6 Box 215, Duncan, Oklahoma since 1989. Both Jimmie and Janet are "Property Owner Plaintiffs" and "P.I. Plaintiffs" as those defined terms are used in this Complaint. They are collectively referred to as "the Williamses."

314.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Williamses obtained the water they used at their home from a private well on the property. The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Williamses have been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

315.    Prior to learning of the contamination of their groundwater, the Williamses relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, and watering the lawn and garden. In addition, the Williamses consumed fruits and vegetables grown on the property and watered with contaminated well water. The Williamses discontinued usage of the water well upon the announcement of the contamination in July 2011, and have been unable to use the well water for almost any purpose since that time, thus substantially interfering with the use and enjoyment of their property.

316.   Plaintiff Janet Williams has suffered from thyroid problems since 2001.  This illness and disability has resulted from her exposure to contaminated well water.

317.   The Williamses have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  They have both endured extreme stress upon learning of the contamination.  They can no longer sleep through the night due to stress and worry of added water bills and devalued property all due to the contamination.

318.   The value of the Williamses' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

**Deborah Willis**

319.   Plaintiff Deborah Willis resided at the property located at 5505 North Highway 81, Duncan, Oklahoma from May 1974 through November 1977.  Ms. Willis is a "P.I. Plaintiff" as that defined term is used in this Complaint.

320.   During the time that she lived at the above address, Ms. Willis obtained the water she used at her home from a private well on the property.  The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions.  Accordingly, Ms. Willis has in the past

been exposed to, and, as alleged below, injured by, the groundwater contaminated by

Halliburton.

321.    During the time she resided at the above address, Ms. Willis relied on the

contaminated well water for the purposes of drinking, cooking, bathing, washing dishes,

watering the lawn and garden, and filling a pool for recreational swimming.  In addition,

Ms. Willis consumed fruits and vegetables grown on the property and watered with

contaminated well water every summer.

322.    Plaintiff Deborah Willis was diagnosed in 2011 with a non-functioning thyroid.

This illness and disability has resulted from her exposure to contaminated well water.

323.    Ms. Willis has also suffered mental anguish and emotional distress as a result of

learning that she had unknowingly been drinking, consuming and had otherwise been

exposed to contaminated groundwater for years.

**Carmon and James Womack**

324.    Plaintiffs Carmon and James Womack, husband and wife, currently reside at the

property located at Route 6 Box 258, Duncan, Oklahoma.  Carmon has resided at the

above property since August 2001, and James has resided at the above property since

June 2008.  Both Carmon and James are "PI Plaintiffs" as those defined terms are used in

this Complaint.  They are collectively referred to as "the Womacks."

325.    From the time they moved into the property to the time that they learned of the

contamination of their groundwater in July 2011, the Womacks obtained the water they

used at their home from a private well on the property.  The well sits above and draws

water from groundwater contaminated by the Plume of contamination, defined above,

which has resulted from Halliburton's actions.  Accordingly, the Womacks have been
exposed to, and, as alleged below, injured by, the groundwater contaminated by
Halliburton.

326.    Prior to learning of the contamination of their groundwater, the Womacks relied
on their contaminated well water for the purposes of drinking, cooking, bathing, washing
dishes, watering the lawn and garden, and watering animals and pets.  In addition, the
Womacks consumed fruits and vegetables grown on the property and watered with
contaminated well water daily when in season.  The Womacks discontinued usage of the
water well upon the announcement of the contamination in July 2011 for purposes other
than cooking, bathing, washing dishes, watering the lawn, and watering animals and pets,
and have been unable to use the well water for almost any other purpose since that time,
thus substantially interfering with the use and enjoyment of their property.

327.    Plaintiff James Womack has experienced stomach pains since 2009.  This illness
and disability has resulted from his exposure to contaminated well water.

328.    Plaintiff Carmon Womack has suffered from reproductive problems since 2009.
This disability resulted from her exposure to contaminated well water.

329.    The Womacks have also suffered mental anguish and emotional distress as a result
of learning that they had unknowingly been drinking, consuming and had otherwise been
exposed to contaminated groundwater for years.  The Womacks feel trapped and unsafe.
Carmon Womack has lost sleep and is currently sleeping only four to five hours per
night.  She has had to change her lifestyle based on the contamination she has been

exposed to, can no longer eat from her garden, and has experienced an increase in monthly bills all due to the contamination.

**Greg and Dena Wortham**

330.    Plaintiffs Greg and Dena Wortham, husband and wife, have owned and resided at the property located at Route 2 Box 81F, Marlow, Oklahoma since 1994. Both Greg and Dena are "Property Owner Plaintiffs" and "PI Plaintiffs" as those defined terms are used in this Complaint. They are collectively referred to as "the Worthams."

331.    From the time they moved into the property to the time that they learned of the contamination of their groundwater in July 2011, the Worthams obtained the water they used at their home from a private well on the property The well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from Halliburton's actions. Accordingly, the Worthams have been exposed to, and, as alleged below, injured by, the groundwater contaminated by Halliburton.

332.    Prior to learning of the contamination of their groundwater, the Worthams relied on their contaminated well water for the purposes of drinking, cooking, bathing, washing dishes, watering the lawn and garden, and filling a pool for recreational swimming. In addition, the Worthams often consumed fruits and vegetables grown on the property and watered with contaminated well water. The Worthams continued usage of the water well upon the announcement of the contamination in July 2011.

333.    Plaintiff Dena Wortham was diagnosed in 2003 with hypothyroidism. This illness and disability has resulted from her exposure to contaminated well water.

334.    The Worthams have also suffered mental anguish and emotional distress as a result of learning that they had unknowingly been drinking, consuming and had otherwise been exposed to contaminated groundwater for years.  They have also endured stress from having to move their livestock to prevent them from being harmed by the contaminated water.

335.    The value of the Worthams' property has been greatly diminished as a result of the contamination.  Prospective buyers will be unwilling to purchase a property with a contaminated well, and, even if a reliable alternative water source is obtained, the value of the property will forever be greatly diminished by the past contamination issues at the property and in the vicinity of Duncan, Oklahoma generally.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: NEGLIGENCE AND/OR GROSS NEGLIGENCE AGAINST HALLIBURTON AND BENHAM

336.    Plaintiffs reallege and restate the allegations in paragraphs 1–335 above as if fully set forth herein.

337.    Halliburton owes and continues to owe a duty to all Plaintiffs to exercise ordinary care and diligence so as to perform its operations safely, taking into consideration the effects of its operations on its neighbors and community.  The duties Halliburton owed and continues to owe to Plaintiffs include, but are not limited to, the following:

   a.   To dispose of its wastes, including  wastewater and ash contaminated with ammonium perchlorate and/or nitrates in a manner that protects Plaintiffs and the environment from unreasonable harm;

b.  To prevent the migration of pollutants dangerous to human health and the environment from the Halliburton facility into the groundwater and onto Plaintiffs' properties;

c.  To monitor the groundwater for possible migration of dangerous contaminants;

d.  To inform Plaintiffs in a prudent and timely manner of, and take any action necessary to protect them from the hazards of exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations at its facility; and

e.  To protect Plaintiffs from being harmed by exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations, including by providing them with an alternate source of water, and continuously monitoring and informing Plaintiffs of contaminant levels.

338.  Benham owes and continues to owe a duty to all Plaintiffs to exercise ordinary care and diligence so as to conduct its environmental work thoroughly and with competence. The duties Benham owed and continues to owe to Plaintiffs include, but are not limited to, the following:

a.  To monitor and prevent the migration of pollutants dangerous to human health and the environment from the Halliburton facility into the groundwater and onto Plaintiffs' properties;

b.  To monitor the groundwater for possible migration of dangerous contaminants;

c.  To inform Plaintiffs in a prudent and timely manner of, and take any action necessary to protect them from the hazards of exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations at its facility; and

d.  To protect Plaintiffs from being harmed by exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations, including by monitoring and informing Plaintiffs of contaminant levels.

339.   Halliburton knowingly breached these duties by failing to take reasonable care and allowing contaminants to escape into the groundwater and migrate offsite to Plaintiffs' properties.  Halliburton's breaches of ordinary care and diligence include, but are not limited to, the following:

a.  Failing to dispose of contaminated wastewater in a safe manner that did not harm Plaintiffs;

b.  Failing to dispose of rocket propellant and ash in a safe manner that did not harm Plaintiffs;

c.  Failing and continuing to fail to prevent the migration of hazardous chemicals from the Halliburton facility onto Plaintiffs' properties;

d.  Failing to monitor for perchlorate in the groundwater prior to 2011;

    e.  Failing to monitor for nitrates or any other contaminants in the groundwater from July of 2005 to June of 2009;

    f.  Failing to alert Plaintiffs to the presence of high levels of nitrate and perchlorate in the groundwater; and

    g.  Such other breaches as may become apparent during the course of discovery in this matter.

340.  Benham knowingly breached these duties by failing to take reasonable care and failing to properly test for and monitor contamination in the groundwater at and surrounding the Osage Road facility, allowing contaminants to migrate offsite to Plaintiffs' properties without any warning to Plaintiffs. Benham's breaches of ordinary care and diligence include, but are not limited to, the following:

    a.  Failing and continuing to fail to prevent the migration of hazardous chemicals from the Halliburton facility onto Plaintiffs' properties;

    b.  Failing to monitor for perchlorate in the groundwater prior to 2009;

    c.  Failing to monitor for nitrates or any other contaminants in the groundwater from July of 2005 to June of 2009;

    d.  Failing to alert Plaintiffs to the presence of high levels of nitrate and perchlorate in the groundwater; and

    e.  Such other breaches as may become apparent during the course of discovery in this matter.

341.  Halliburton's conduct constitutes gross negligence as it knew or was substantially unconcerned that there was a substantial and unnecessary risk that its practices would

result in serious injury to Plaintiffs.  This is apparent from Halliburton's actions and/or inactions described above, including, but not limited to Halliburton's:

a.  Using an unlined evaporation pond for years, and using unlined burn pits for the entire extent of the rocket motor recovery operations, despite knowing that such practices allowed contamination to escape directly into soils and the groundwater;

b.  Knowing that rain caused contaminated water to escape the evaporation pond and burn pits onto soil and into the groundwater, but failing to take any measures to protect against that risk or prevent it from happening;

c.  Covering burn pits for years without keeping any record of where they were located, taking any steps to clean the burn pits prior to covering them, or taking any steps to prevent further migration of contamination from the unlined burn pits after covering them with soil, for example by capping the pits;

d.  Failure to test for perchlorate in the groundwater prior to 2009, despite knowing of perchlorate contamination at the facility for decades and expressly acknowledging the likelihood of perchlorate contamination in the groundwater since at least 2008;

e.  Failure to alert nearby residents, including Plaintiffs, of contaminated groundwater even after knowledge that Halliburton's own on-site well could no longer be used for drinking water because of contamination of the groundwater at the facility;

      f.  Failure to alert any local residents, including Plaintiffs, of extremely high

          levels of nitrates in the groundwater;

342.   Halliburton's gross negligence and reckless disregard for the rights of others

entitles Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs

from any statutory cap on damages arising from bodily injury.

343.   As a direct and proximate result of Halliburton's negligence and/or gross

negligence, Plaintiffs have sustained the damages more fully described above.

344.   Halliburton was also and/or in the alternative negligent under the doctrine of res

ipsa loquitur because the perchlorate was under Halliburton's exclusive control and the

high levels of perchlorate would not have migrated to Plaintiffs' wells in the ordinary

course of events if due care had been exercised.

## SECOND CAUSE OF ACTION: NEGLIGENCE PER SE AGAINST

## HALLIBURTON

345.   Plaintiffs reallege and restate the allegations in paragraphs 1–344 above as if fully

set forth herein.

346.   Defendant violated Oklahoma Statute Title 27A, section 2-6-105, which declares it

"unlawful for any person to cause pollution of any waters of the state or to place or cause

to be placed any wastes in a location where they are likely to cause pollution of any air,

land or waters of the state" because Halliburton caused contaminants, including

perchlorate and nitrates, to pollute the groundwater of Oklahoma under and surrounding

the Halliburton facility and Plaintiffs' properties.

347.   Defendant also violated Article 2, section 23 of the Oklahoma Constitution by damaging Plaintiffs' properties due to Halliburton's own private acts, without the consent of the Plaintiffs.

348.   The above statute and Constitutional provision were and are intended to prevent injuries such as those suffered by Plaintiffs because Plaintiffs rely on Oklahoma groundwater for their drinking and other daily uses, and because Plaintiffs' properties were damaged by Halliburton's activities.

349.   Plaintiffs are within the class of persons intended to be protected by this statute and Constitutional provision because they are private citizens of the State of Oklahoma and they rely on clean public water and have protectable property interests within the State.

350.   Plaintiffs' injuries were directly and proximately caused by the Defendant's violation of this statute and Constitutional provision as described above.

351.   Halliburton's reckless disregard for the rights of others in violating this statute and Constitutional provision and in acts described more fully above entitles Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs from any statutory cap on damages arising from bodily injury.

## THIRD CAUSE OF ACTION: PRIVATE NUISANCE AGAINST HALLIBURTON

352.   Plaintiffs reallege and restate the allegations in paragraphs 1–351 above as if fully set forth herein.

353.   Halliburton owns and operates the Osage Road facility, which is in close proximity to properties currently or formerly owned by Property Owner Plaintiffs, as

alleged in detail above.  The Osage Road facility is also in close proximity to the

properties where Non-Owner Resident Plaintiffs resided, as alleged in detail above.

354.    Halliburton's actions, which resulted in contamination of the well water of

Property Owner Plaintiffs and the well water used by Non-Owner Resident Plaintiffs,

unreasonably and substantially interfered with and invaded, and continue to interfere with

and invade, Property Owner Plaintiffs' and Non-Owner Resident Plaintiffs' property

rights, including their respective rights to use and enjoyment of the properties.

Specifically, upon being informed of the contamination in their wells in July 2011,

Property Owner Plaintiffs and Non-Owner Resident Plaintiffs have not been able to use

the private wells and well water on the relevant properties, severely limiting the ways in

which they can use and enjoy the properties.  Halliburton's actions therefore constitute a

private nuisance.

355.    The continuing migration and resulting contamination of Property Owner

Plaintiffs' properties and the properties where Non-Owner Resident Plaintiffs reside by

hazardous substances from the Halliburton facility unreasonably and substantially

interferes with and is an invasion of Property Owner Plaintiffs' and Non-Owner

Residents' property rights, including their right to use and enjoyment of their properties,

and therefore constitutes a continuing nuisance so long as such interference and invasion

does not cease.

356.    Plaintiffs do not and have never consented to Halliburton causing hazardous

substances to physically invade and interfere with their properties.

357.   Halliburton knew or should have known at all relevant times that the hazardous substances that it caused to enter into the groundwater would migrate offsite and invade and interfere with Property Owner Plaintiffs' and Non-Owner Resident Plaintiffs' private property rights.

358.   As a direct and proximate result of Halliburton's nuisance and its failure to abate the nuisance, Property Owner Plaintiffs and Non-Owner Resident Plaintiffs have suffered the damages more fully described above.

359.   Halliburton's reckless disregard for the rights of others in creating and continuing this nuisance and in acts described more fully above entitles Property Owner Plaintiffs and Non-Owner Resident Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs from any statutory cap on damages arising from bodily injury.

## FOURTH CAUSE OF ACTION: PUBLIC NUISANCE AGAINST HALLIBURTON

360.   Plaintiffs reallege and restate the allegations in paragraphs 1–359 above as if fully set forth herein.

361.   Halliburton has caused a public nuisance under Oklahoma Statutes Title 50, section 2 in that its actions "affect[] at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal" because their pollution extends to and impacts many homes in the area of the facility.

362.   Halliburton has also caused a public nuisance under Oklahoma Statutes Title 27A, section 2-6-105 in that Halliburton acted "to cause pollution of any waters of the state or

to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state" because it allowed perchlorate and nitrates to contaminate the groundwater of Oklahoma.

363.    Plaintiffs have suffered special injury from Halliburton's public nuisance in that their private wells or, with respect to Non-Owner Resident Plaintiffs, the private wells they relied upon, are and have been contaminated with perchlorate and nitrates. Moreover, PI Plaintiffs have suffered personal injuries from their continued exposure to contaminated water, as described more fully above.

364.    Halliburton's reckless disregard for the rights of others in creating and continuing this public nuisance by violating the above named statutes and in acts described more fully above entitles Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs from any statutory cap on damages arising from bodily injury.

### FIFTH CAUSE OF ACTION: TRESPASS AGAINST HALLIBURTON

365.    Plaintiffs reallege and restate the allegations in paragraphs 1–364 above as if fully set forth herein.

366.    Halliburton intentionally deposited wastewater contaminated with ammonium perchlorate and/or nitrates into an evaporation pond and solid waste containing ammonium perchlorate and/or nitrates into unlined burn pits on its property, knowing that these contaminants could and did infiltrate the groundwater.

367.    This contaminated wastewater migrated off of Halliburton's property and physically invaded the property of the Property Owner Plaintiffs and the property where the Non-Owner Resident Plaintiffs reside via the groundwater, and continues to so

migrate and invade these properties by appearing in the private wells, plumbing, tap

water and the soil and groundwater under their homes and in their yards.

368.    Halliburton had no right or permission to cause these chemicals to enter the

property of the Plaintiffs described above, but merely allowed these chemicals to enter

those properties for Halliburton's own purpose, pleasure or convenience as it was the

result of Halliburton's business activities.

369.    Halliburton's reckless disregard for the rights of others in committing this trespass,

and allowing it to continue unabated and without warning the Plaintiffs of its dangers and

in acts described more fully above entitles Plaintiffs to an award for punitive or

exemplary damages and exempts Plaintiffs from any statutory cap on damages arising

from bodily injury.

**SIXTH CAUSE OF ACTION: STRICT LIABILITY AGAINST HALLIBURTON**

370.    Plaintiffs reallege and restate the allegations in paragraphs 1–369 above as if fully

set forth herein.

371.    Plaintiffs believe and allege above that the exercise of due care could have and

should have prevented the contamination of groundwater at and surrounding the Osage

Road facility.  In the event that discovery in this matter reveals that the risks posed by the

contaminated wastewaters and ash could not have been eliminated, even by the exercise

of reasonable care and prudence in handling them, Halliburton is still alternatively liable

in this action because it was engaged in an abnormally dangerous activity, as alleged

below.

372.    Halliburton's disposal of harmful contaminants, including ammonium perchlorate, at the Osage Road facility constitutes an abnormally dangerous condition and/or activity.

373.    Halliburton's actions posed a high risk of serious harm to residents in nearby communities because Halliburton was working with dangerous contaminants that could easily pollute the groundwater on which surrounding properties relied for their drinking water.

374.    As Halliburton knew, both perchlorate and nitrates are highly soluble, stable, and mobile in groundwater and would likely migrate offsite.

375.    Halliburton's actions in cleaning used rocket engines and disposing of the contaminated wastes in an evaporation pond and unlined burn pits are not matters of common usage in the community, and are especially not appropriate where private residents who rely on private wells for their drinking water live near the facility.

376.    As a result of Halliburton's actions, Property Owner Plaintiffs' properties have been contaminated and have suffered property damage, and PI Plaintiffs and Non-Owner Resident Plaintiffs have suffered the injuries more fully described above.

377.    By allowing, permitting, and failing to stop the migration of contaminated groundwater from the Halliburton facility to the properties described above, Halliburton is strictly liable for the injuries and damages Plaintiffs sustained as a result of this contamination.

378.    Halliburton knew or should have known that by allowing contaminated groundwater to migrate from its facility onto the properties described above, such

contamination would cause, and has caused, the injuries to health and property alleged in this Complaint.

379.   Halliburton's reckless disregard for the rights of others, as evident in its actions exposing Plaintiffs to high risks of harm from its abnormally dangerous activities and in acts described more fully above entitles Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs from any statutory cap on damages arising from bodily injury.

380.   Halliburton is also strictly liable for Plaintiffs' property damages under the Oklahoma Constitution, Article 2, section 23 because Halliburton's private activities in handling and disposing of dangerous contaminants substantially damaged the private property of the Plaintiffs without their consent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this court:

a.  As to Counts I, II, V and VI:

i.  Award compensatory damages for Property Owner Plaintiffs for diminution of the value of Property Owner Plaintiffs' property;

ii.  Award compensatory damages for all Plaintiffs for the mental anguish and suffering caused by learning of their past unknowing exposure to water contaminated by Halliburton;

iii.  Award compensatory damages for PI Plaintiffs for the personal injuries they allege above, including compensation for:

1.  medical costs incurred by each PI Plaintiff,

    2.  compensation for pain and suffering resulting from PI Plaintiffs' injuries, and

    3.  compensation for emotional distress suffered by PI Plaintiffs;

  iv.  Establish a medical monitoring fund for those PI Plaintiffs who suffer personal injuries, and for any other Plaintiffs to the extent recognized under Oklahoma law;

  v.  Award punitive damages against Halliburton;

  vi.  Award costs of this action including attorneys' fees to the Plaintiffs; and

  vii.  Award such other and further relief as this court may deem appropriate.

b.  As to Count III and IV:

  i.  Award compensatory damages for Property Owner Plaintiffs for diminution of the value of Property Owner Plaintiffs' property;

  ii.  Award compensatory damages for PI Plaintiffs for the personal injuries they allege above, including compensation for:

    1.  medical costs incurred by each PI Plaintiff,

    2.  compensation for pain and suffering resulting from PI Plaintiffs' injuries, and

    3.  compensation for emotional distress suffered by PI Plaintiffs;

iii.  Award compensatory damages for all Plaintiffs for the mental anguish and suffering caused by learning of their past unknowing exposure to water contaminated by Halliburton;

iv.  Award compensatory damages for Property Owner Plaintiffs' past and future lost use and enjoyment of their property, including the inability to fully use and enjoy their private well and well water;

v.  Award compensatory damages for Non-Resident Owner Plaintiffs' past and future lost use and enjoyment of the property at which they reside, including the inability to fully use and enjoy their private well and well water; and

vi.  Award such other and further relief as this court may deem appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable herein.

Respectfully submitted,

Joe S. Carson OBA No. 19429
Homsey, Cooper, Hill, & Carson
4816 Classen Boulevard
Oklahoma City, OK 73118
Phone: 405-843-9923
Fax: 405-848-4223
jsc@homseylawcenter.com

Dated:

and

Todd Ommen
Weitz & Luxenberg, P.C.
700 Broadway, 5th Floor

New York, NY 10003
Phone: 212-558-5592

ATTORNEYS FOR PLAINTIFFS

**ATTORNEY LIEN CLAIMED**